Scileppi, J.
Defendants, after a trial by jury, were convicted of selling an obscene book, to wit, “ Tropic of Cancer ” by Henry Miller, in violation of section 1141 of the Penal Law[1]. The County Court reversed their convictions and dismissed the information. This case presents for consideration the recurring question of what constitutes obscene literature under the aforementioned statute in light of the guarantees of freedom of expression contained in both the Federal and State Constitu *121 tions. We have concluded that “ Tropic of Cancer ” is obscene within the meaning of our statute and is not within the area of constitutional protection.
It is by now well established that the State of New York, in the exercise of its police power, may enact legislation designed to suppress the sale and distribution of salacious literature (Smith v. California, 361 U. S. 147; Roth v. United States, 354 U. S. 476). This our Legislature has done by the enactment of section 1141 of the Penal Law, which embodies the recognition that the public interest demands protection against the damaging impact of obscenity on the moral climate of the community. The need for this protection has been highlighted in recent years as the People of this State have been exposed to an ever-increasing amount of printed material featuring sex and sensationalism which, aided by new methods of merchandising, are sold not only in bookstores but from open racks in candy stores and similar outlets. As the dissemination of this material has become more widespread, there has been an increased awareness of the serious problem it creates. Legislative committees of both the State[2] and Federal[3] Governments, as well as other groups[4], have *122 conducted hearings and issued reports which reflect the alarming decline in the moral climate of our times. These reports emphasize the need for obscenity laws as a safeguard in the public interest and the necessity for their proper enforcement. The need for this public protection was reaffirmed in the Supreme Court of the United States in Roth v. United States (354 U. S. 476, supra), which held that it is not a violation of the guarantees of freedom of speech and of the press under the First Amendment of the Constitution to suppress or prohibit the publication, distribution and sale of obscene literature. The court there stated (pp. 484-485): “ All ideas having even the slightest redeeming social importance — unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion — have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over 50 nations, in the obscenity laws of all the 48 States, and in the 20 obscenity laws enacted by the Congress from 1842 to 1956.”
While the State’s right to enact such legislation cannot be doubted, the application of the legislative mandate to specific *123 subjects may not be so broad as to impinge upon the right of free expression guaranteed to all citizens. Thus the determination of whether a particular work is legally obscene requires us to strike a balance in each case between these fundamental freedoms and the State’s interest in the welfare of its citizens.
The term “ obscenity ”, however, is not susceptible of precise definition. It must be viewed in juxtaposition to time, place and circumstance, so that whether a particular work falls within the ambit of constitutional protection or is subject to regulation by the State must be determined by a case by case process of inclusion and exclusion. But, while the exact boundaries of obscenity cannot be sharply drawn, the Supreme Court, in Roth v. United States (supra) and Manual Enterprises v. Day (370 U. S. 478), set forth guidelines and prescribed the essential elements which must conjoin before it can be found that a publication is obscene by constitutional standards. The first of these elements is the so-called “prurient interest” test set forth in Both, that is, “ whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest ” (Roth v. United States, supra, p. 489). The second, contained in Manual Enterprises, requires that, in addition to the “ prurient interest ” test, it is necessary to establish that the challenged material is also “patently offensive ” to current community standards of decency (Manual Enterprises v. Day, supra, p. 482). In addition to the foregoing tests imposed by the decisions of the Supreme Court, this court interpreted section 1141 of the Penal Law in People v. Richmond County News (9 N Y 2d 578, 586) as applicable only to material which may properly be termed “ hard-core pornography ”.
It is our opinion that, judged by all three of the established legal standards, “ Tropic of Cancer ” does not fall within the class of publications entitled to constitutional protection.
Significantly, the jury was instructed that to convict the defendants they must find the book to be obscene under all of the standards discussed above, that is, the tests of ‘ ‘ prurient interest”, “patent offensiveness” and “hard-core pornography”. Formerly their determination of this question would have been deemed conclusive unless as a matter of law the writing could be said to be so innocuous as to forbid its submission *124 to the trier of the facts (People v. Pesky, 254 N. Y. 373). However, as this court stated in the Richmond County News case (supra, pp. 580-581): “This court, as the State’s highest tribunal, no less than the United States Supreme Court, cannot escape its responsibility in this area ‘ by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as “ obscene,” for, if “ obscenity ” is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional judgment of the most sensitive kind. ’ (Roth v. United States, 354 U. S. 476, 497-498 [Harlan, J., concurring] * * *.) It involves not a simple question of fact, but a mixed question of fact and constitutional law, calling upon the court to make an appraisal of a publication and its contents against the requirements embodied in both State and Federal Constitutions ”.
In the exercise of our duty to make an independent constitutional appraisal, we have read the book carefully and conclude that it is nothing more than a compilation of a series of sordid narrations dealing with sex in a manner designed to appeal to the prurient interest.[5] It is devoid of theme or ideas. Throughout its pages can be found a constant repetition of patently offensive words used solely to convey debasing portrayals of natural and unnatural sexual experiences. It is a blow to sense, not merely sensibility. It is, in short, ‘ ‘ hard-core pornography”, dirt for dirt’s sake (United States v. One Book Called “ Ulysses ”, 5 F. Supp. 182), and dirt for money’s sake (Kingsley Pictures Corp. v. Regents, 360 U. S. 684, 692). We see no reason for adopting an unrealistic appraisal of the nature of this book when there is such overwhelming proof of its ineompatability with the current moral standards of our community. If, as the County Court held, this book is not obscene as a matter *125 of law, it is difficult to conceive when, if ever, a book can be held to be obscene under any established legal standard.
Defendants contend that even if “Tropic of Cancer ” is obscene when judged by the established tests, it is nevertheless, under the Roth case (supra), entitled to protection because it has “ substantial literary merit”. We do not interpret Roth, or any other authority, as establishing any such rule of law. Defendants place reliance upon the court’s statement in Roth that “ implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance ” (354 U. S., supra, p. 484). But it does not follow that the converse is true; indeed, if such were the case the holding in Roth would be vitally eroded, for the test as pronounced there is the appeal to the prurient interest of the average person in the contemporary community. It does not follow, then, that because an alleged work of literature does not appeal to the prurient interest of a small group of intellectuals that it is not obscene under the prurient interest, or for that matter any other legal test of obscenity. This would permit the substitution of the opinions of authors and critics for those of the average person in the contemporary community. The fact that a few literary figures have commented favorably on this book and have lent it their prestige does not expunge from its pages the flagrantly obscene and patently offensive matter which dominates the book as a whole.
Moreover, if a publication may not be held obscene when it appeals to the prurient interest of (or is patently offensive to) only a particular segment of the community, such as children, the pious or the prudish, then, conversely, its nonobscenity may not be gauged by the lack of impact it has on the literary community.
A book may not be judged by its cover, its introduction or the laudatory comments contained in the publisher’s blurbs — rather it must be judged by its actual contents. It requires little perception or imagination to conceive that the actual contents of a book may completely negate these testimonials and indorsements. Nor does the fact that the author enjoys Avide acclaim as a Avriter control, for the book must be judged, not by the reputation of the author, but by Avhat he writes in it. To hold otherwise Avould give recognized writers the freedom to traffic *126 in obscenity at will under the guise of creating a work of art. This court will not adopt a rule of law which states that obscenity is suppressible but that well-written obscenity is not.
There still remains for consideration and disposition the issue of scienter, for even though a publication is obscene, a conviction may not stand without proof of scienter on the part of those charged with a violation of section 1141 of the Penal Law.
We are without power to make a final disposition of this issue now. The County Court’s reversal of the defendants’ convictions and the dismissal of the information was on the law and the facts. Its opinion makes it evident that, while the dismissal of the information was based on its conclusion that ‘ ‘ Tropic of Cancer ” was not obscene as a matter of law, the jury’s finding on the issue of scienter was against the weight of the evidence. Accordingly, a new trial must be ordered.
The order appealed from should be reversed and a new trial ordered on the issue of scienter.

. § 1141. Obscene prints and articles.
“1. A person who sells, lends, gives away, distributes, shows or transmutes, or offers to sell, lend, give away, distribute, show or transmute, or has in his possession with intent to sell, lend, distribute, give away, show or transmute, or advertise in any manner, or who otherwise offers for loan, gift, sale or distribution, any obscene, lewd, lascivious, filthy, indecent, sadistic, masochistic or disgusting book, magazine, pamphlet, newspaper, story paper, writing, paper, card, phonograph record, picture, drawing, photograph, motion picture film, figure, image, phonograph record or wire or tape recording, or any written, printed or recorded matter of an indecent character which may or may not require mechanical or other means to be transmitted into auditory, visual or sensory representations of such character; or any article or instrument of indecent or immoral use, or purporting to be for indecent or immoral use or purpose, * * *
“ Is guilty of a misdemeanor ”.

. In 1963 the Report of the New York State Joint Legislative Committee to Study the Publication and Dissemination of Offensive and Obscene Material under “ Conclusions ”: “ That the wide availability of obscene and near obscene materials is undermining our standard of conduct, fostering disrespect for duly constituted authority and contributing to delinquency and crime.”
In 1962 report of the same committee (N. Y. Legis. Doc., 1962, No. 77, p. 11) : “As indicated in prior reports, it [the Committee] has specifically concluded that disseminations of this type [referring to glorifying and condoning immoral acts or which describe lurid, illegal or unnatural sex practices] are contributing to juvenile delinquency, inciting to sex crime, leading to perversion and posing a serious threat to our standards of morality.”

. “ Hearings before Subcommittee on Constitutional Amendments and Subcommittee to Investigate Juvenile Delinquency of the Committee on the Judiciary United States Senate Eighty-sixth Congress First and Second Sessions.”

. “ STATEMENT ON SALACIOUS LITERATURE
By
The New York Academy of Medicine Committee on Public Health
“ On the basis of the incomplete information submitted to it, the Academy is of the opinion that the reported increase in sales of salacious literature to adolescents is one of a number of social ills reflecting a breakdown in the home and an inadequate environment. Since adverse forces seem to be concentrated *122 on teenagers, deliberations on the[1] problem were limited to effects of erotic literature on this age group.
“ The Academy believes that although some adolescents may not be affected by the reading of salacious literature, others may be more vulnerable. Such reading encourages a morbid preoccupation with sex and interferes with the development of a healthy attitude and respect for the opposite sex. It is said to contribute to perversion. In the opinion of some psychiatrists, it may have an especially detrimental effect on disturbed adolescents.
“ Behavior is complex. It is difficult, if not impossible, to prove scientifically that a direct causal relation exists between libidinous literature and socially unacceptable conduct. Yet, it is undeniable that there has been a resurgence of venereal disease, particularly among teen-age youth, and that the rate of illegitimacy is climbing. It may be postulated that there is a correlation between these phenomena and the apparent rise in the sale of salacious literature, and perhaps it is causal, but the latter observation cannot be definitely demonstrated. It can be asserted, however, that the perusal of erotic literature has the potentiality of inciting some young persons to enter into illicit sex relations and thus of leading them into promiscuity, illegitimacy and venereal disease.”

. Obscene and filthy passages are to be found on the following pages in the hard cover edition: 4, 5, 6, 7, 16, 18, 20, 24, 25, 28, 32, 36, 39, 40, 42, 43, 44, 45, 46, 47, 52, 53, 54, 56, 58, 59, 60, 62, 73, 80, 85, 87, 89, 92, 97, 100, 101, 102, 103, 104, 105, 107, 111, 112, 113, 114, 115, 116, 117, 118, 120, 121, 122, 123, 124, 126, 127, 134, 135, 139, 140, 141, 142, 144, 145, 146, 156, 159, 160, 171, 172, 175, 188, 190, 193, 202, 203, 207, 215, 216, 217, 220, 225, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 246, 247, 248, 249, 250, 256, 257, 258, 259, 272, 273, 274, 282, 283, 288, 289, 290, 291 and 292.