**UNITED STATES of America,
Appellee,**

v.

**Irving KLAW and Jack Kramer,
Defendants-Appellants.**

**No. 70, Docket 28887.**

United States Court of Appeals
Second Circuit.

Argued Oct. 15, 1964.

Decided July 15, 1965.

Richard A. Givens, Asst. U. S. Atty., Southern Dist. of New York (Robert M Morgenthau, U. S. Atty., Andrew T. Mc-Evoy. Jr., and John S. Martin, Jr., Asst. U. S. Attys., on the brief), for appellee.

Joseph E. Brill, New York City (Robert E. Goldman and Bernard J. Levy, New York City, on the brief), for appellants.

Before WATERMAN, MOORE and SMITH, Circuit Judges.

MOORE, Circuit Judge:

Irving Klaw and Jack Kramer were indicted on one count for conspiring to violate 18 U.S.C.A. § 1461 by knowingly using the mails for the carriage of "articles, matters, and things, which were non-mailable in that they were obscene, lewd, lascivious, indecent, filthy and vile." They were also charged with having knowingly used the mails to dis·tribute "circulars, advertisements and notices which were non-mailable in that they gave information directly and indirectly, where, how, from whom and by what means certain obscene, lewd, lascivious, indecent, filthy and vile matters and things might be obtained." In addition, Klaw was indicted on forty-three counts for using the mails to transmit "certain articles, matters and things * * *, to wit, printed circulars, pamphlets, booklets, drawings, photographs and motion picture films, which were non-mailable in that they were obscene, lewd lascivious, indecent, filthy and vile." Nine of these counts were eventually dismissed, leaving thirty-four. Klaw was also indicted on forty-one counts for using the mails to carry certain "circulars, advertisements and notices, * * which were non-mailable in that they gave information directly and indirectly, where, how, from whom and by what means, certain obscene, lewd, lascivious, indecent, filthy and vile articles, matters and things might be obtained." Eleven of these counts were eventually dismissed, leaving thirty.

The conspiracy was said to have run from June 1, 1960, until the date of the indictment, June 27, 1963. The substantive counts were each based on individual mailings of materials over a period running from July 25, 1958, to May 6, 1963.

At a jury trial, the Government pro·duced six witnesses whose receipt (or

whose son's receipt) of circulars and materials had been the basis of thirteen of the thirty-four "obscene materials" counts and ten of the thirty "publicizing" counts. The lion's share of these mailings had been to one Duane Thoman of LaGrange, Kentucky, which name was one of the 300 or so aliases of Postal Inspector Harry Simon of Washington, D. C., who testified at the trial. Three of the Government's witnesses were parents who, while rummaging through Junior's bureau drawer, found that their respective adolescent offspring were exploring on their own a new world just coming into view. One Junior also testified but only as to his receipt of items from Nutrix.

Klaw is the owner of Nutrix Co., a New York based establishment that prints and publicizes materials—stories, photographs and drawings in the "bondage" genre. Much solicitation and distribution is carried on through the mails, particularly by way of mail order ads appearing in magazines likely to have a male clientele. These "bondage" booklets usually contain some twenty to twenty-five photographs or crude drawings of females—some scantily clad, some tightly trussed, and all voluptuous—subjecting other women and men to various tortures and indignities, including violent and forcible deformation of the body, while being gagged, fettered and bound in bizarre postures. The booklets bore such titles as "Sorority Girls Stringent Initiation," "Female Doctor Forced into Bondage," "Girls Concentration Camp Ordeals," "Dominating Woman Turns Man into Girl," "Men in the Ladies Room," and the like. A text in each booklet described in a puerile and asinine fashion the activity depicted in the drawings. One booklet entitled "The Devil of Yocherwalden" pictures female "Gazi" guards subjecting female prisoners to brutal tortures at the direction of the "Gazi" commandant "Elsi Achstunk." The captives and tormentors are drawn with exaggerated female physical characteristics, clothed in tight-fitting garments, wearing black leather shoes with very high heels, and posed in unreal positions. There were also photographs of "Fighting Girls," corset and high heel shoe scenes, and girls in rubber apparel. Photographs offered for sale were in many instances taken from motion pictures said to have been recently released, such as "Blood of the Vampire," "Slaves of Carthage," and "The Mystery of the Black Whip." Amateur "bondage" photographs were often solicited. Bulletins published by Nutrix advertised its publications in various bondage series. All these materials are described to us as being "sado-masochistic," and we are referred to Krafft-Ebing's *Psychopathia Sexualis* for further elucidation.

Nutrix is apparently a long-time disseminator of substantially the same type of bondage materials as those involved here. Surveillance by the Postal authorities (Inspector Simon) had commenced in 1951 and continued for four years, at which time no criminal reference was made. However, an administrative proceeding was then begun which culminated in the Postmaster-General's ordering that mail addressed to Klaw be marked "unlawful" and returned to the sender, pursuant to then 39 U.S.C.A. § 259a (now 39 U.S.C.A. § 4006). Klaw sought to enjoin the Postmaster from implementing that order, but was unsuccessful. See *Klaw v. Schaffer*, 151 F.Supp. 534 (S.D. N.Y.1957). This court affirmed *per curiam* the District Court's conclusion that the Postmaster General had acted within his statutory authority and that there was substantial evidence in that record to support the hearing examiner's finding that the material was obscene. 251 F.2d 615 (2d Cir. 1958). This court's judgment was vacated by the Supreme Court on other grounds and the complaint was dismissed. 357 U.S. 346, 78 S.Ct. 1369, 2 L.Ed.2d 1368 (1958). Thereupon Inspector Simon resumed his investigation. In 1960 he recommended prosecution, but no official action was taken until 1963. Kramer apparently began working for Nutrix in 1960 as manager of the New Jersey warehouse. In addition to these facts, the jury also had visual im-

pressions from observation of the Nutrix materials introduced on trial.

Defendants were found guilty on each of the sixty-five counts that went to the jury. Klaw received concurrent sentences of two years' imprisonment on counts 1 to 5, with a $1,000 fine on each count; he received a suspended sentence on each of the remaining counts.[1] Kramer was fined $2,500 on count 1 and received a suspended sentence. Both Klaw and Kramer appeal, claiming that their motion for a directed verdict of acquittal was erroneously denied because there was insufficient evidence relating the Nutrix materials to "obscenity" or to "prurient interest."

In approaching this controversy arising out of another of our society's attempts at censorship, it is helpful to have in mind the scope of the problem and the variety of ways in which it arises. Cases in the Supreme Court over the past decade or so have come into being because state and city police officers, state attorneys general and federal district attorneys, state motion picture licensing bureaus, state youth morality commissions, federal Post Office Examiners and Inspectors, state and federal judges, and juries have considered a variety of

movies, books and magazines to be "sacrilegious," "immoral," "obscene," or "objectionable." The specific items have run the gamut from motion pictures like "The Miracle," "La Ronde," "M," "Native Son," "The Game of Love," "Lady Chatterley's Lover," "Les Amants," and "A Stranger Knocks" to books like "Nights of Horror," "Peyton Place," "Pleasure Was My Business," and "Tropic of Cancer," to magazines like "One—The Homosexual Magazine," "MANual," "Trim," "Grecian Guild Pictorial," "Playboy," "Rogue," "Frolic," other "girlie-type" magazines, and nudist magazines. Publishers, exhibitors, distributors and sellers of these materials have been subjected in state and federal courts and agencies to set-backs including stiff fines and jail sentences, seizure of the materials, injunctions against distribution, denial of licenses needed to exhibit a motion picture, and loss of the privilege to use the United States mails to distribute and publicize the materials.

The censors' successes have been short-lived, however, for in virtually every case decided by the Supreme Court, the disseminator has had a favorable result on one ground or another, save for three cases decided on one day in 1957.[2] Two

1. The conspiracy count was punishable by up to five years' imprisonment and a fine of up to $10,000. 18 U.S.C.A. § 371. Knowing use of the mails for the carriage of non-mailable matter is punishable by up to five years' imprisonment and a fine of up to $5,000 for the first offense, and up to ten years' imprisonment and a fine of up to $10,000 for each subsequent offense. 18 U.S.C.A. § 1461.

2. For convenience we list chronologically the Supreme Court's relevant "obscenity" and censorship decisions. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (movie license; "sacrilegious"); Superior Films, Inc. v. Department of Education (same, "obscene") and Commercial Pictures Corp. v. Regents of the University of the State of New York (same, "immoral"), 346 U.S. 587, 74 S.Ct. 286, 98 L.Ed. 329 (1954); Roth v. United States (conviction; "obscene"), and Alberts v. State of California (same; same), 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Kingsley

Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) (injunction; same); Times Film Corp. v. City of Chicago, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed.2d 72 (1957) (movie license; same); One, Inc. v. Olesen, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352 (1958) (mail; same); Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed. 2d 352 (1958) (same; same); Kingsley Int'l Pictures Corp. v. Regents of the University of the State of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959) (movie license; "immoral"); Smith v. People of State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (conviction; "obscene"); Marcus v. Search Warrants, etc., 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961) (seizure; same); Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed. 2d 639 (1962) (mail; same); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (warnings; "objectionable"); Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676,

are significant here—Roth v. United States and Alberts v. California, both reported at 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), which deal with the constitutional protection and definition of "obscenity," and which constitute the first and apparently only opinion subscribed to by a majority of the Court. In both cases convictions for violation of federal and state statutes pertaining to "obscenity" were upheld by divided Courts—5 to 4 in Roth, and 6 to 3 in Alberts.

But if the censors won the battles of Roth and Alberts, the subsequent application of the principles of those cases suggests that as far as the war against pornography goes, the victory was only Pyrrhic. Since 1957 and Roth the "obscenity" situation has advanced rapidly. Then Lady Chatterley was still enjoying her clandestine sylvan trysts with her earthy gamekeeper; Fanny Hill's lively and apparently continuous actions were known only to the foreign traveling elite or to the reader of a smuggled copy; and "Tropic of Cancer" was still being seized by vigilant customs agents as contraband. Suddenly the entire picture changed. Whether encouraged by the courts, or whether literary styles turned towards super-realism, or both, authors and publishers were quick to capitalize on the "modern" trend—a trend which they largely made. "Lady Chatterley's Lover" in paperback editions was sold to countless thousands with the court's opinion of approbation attached as a major part of its advertising. No longer did Constance enjoy the privacy of her woodland. Millions of eyes ogling with interest ("prurient" interest probably) stared at her and her lover whilst they enjoyed those moments which court opinions cannot describe lest they risk going "substantially beyond customary limits of candor in description or representation of such matters." Roth, supra, 357 U.S. at 487, n. 20, 77 S.Ct. at 1310.

"Tropic of Cancer" was brought out from under the counter and dusted off. In 1962 it was approved (four justices approving, three dissenting) for public reading by a Massachusetts court. See Attorney General v. Book Named "Tropic of Cancer," 345 Mass. 11, 184 N.E.2d 328 (1962). In Wisconsin by an equally close vote (four-to-three), the Supreme Court reversed a lower court decision declaring the book "obscene" and held that, although "[m]uch of the language in the book would be offensive to many" and that in one or two instances the "short English words of ancient origin" were "obscene," nevertheless, despite the fact that some episodes would "appeal to prurient interests," it was the court's duty "to respect and enforce in full measure the freedom of expression guaranteed by state and federal constitutions." McCauley v. Tropic of Cancer, 20 Wis.2d 134, 151, 121 N.W.2d 545, 554 (1963). The Supreme Court of California reviewed a decision determining the book to be "obscene" and, after a comprehensive survey of post-Roth decisions, unanimously reversed. Zeitlin v. Arnebergh, 59 Cal.2d 901, 31 Cal.Rptr. 800, 383 P.2d 152, cert. denied, 375 U.S. 957, 84 S.Ct. 445, 11 L.Ed.2d 315 (1963). The New York Court of Appeals in People v. Fritch, 13 N.Y.2d 119, 243 N.Y.S.2d 1, 192 N.E.2d 713 (1963) also by a four-to-three vote held the same book to be "obscene" and reversed a determination by the County Court to the contrary, thus reinstating a conviction by a jury, although ordering a new trial on the issue of *scienter*. This decision, however, the same court (also by a four-to-three vote) considers as having been "now overruled by Grove Press, Inc. v. Gerstein, 378 U.S.

12 L.Ed.2d 793 (1964) (conviction; "obscene"); A Quantity of Copies of Books v. State of Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964) (seizure; same); Tralins v. Gerstein, 378 U.S. 576, 84 S.Ct.1903, 12 L.Ed.2d 1033 (1964) (injunction; same); Grove Press, Inc. v. Gerstein, 378 U.S. 577, 84 S.Ct. 1909, 12 L.Ed.2d 1035 (1964) (same; same); Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (movie license); Trans-Lux Distrib. Corp. v. Board of Regents of the University of New York, 380 U.S. 259, 85 S.Ct. 952, 13 L.Ed.2d 959 (1965) (same; "obscene").

**160**

577, 84 S.Ct. 1909 [12 L.Ed.2d 1035]." Larkin v. G. P. Putnam's Sons, 14 N.Y.2d 399, 404, 252 N.Y.S.2d 71, 75, 200 N.E.2d 760, 763 (1964).

█ The most cursory perusal of the cases makes it obvious that the various agencies, officers, judges and juries that initially find material "obscene" do not have the last word to say on the matter. Rather, the Supreme Court has left no doubt that any abnegation of judicial supervision in the "obscenity" field would be inconsistent with its duty to uphold constitutional guarantees. The issue "must ultimately be decided by this [the Supreme] Court." Jacobellis v. State of Ohio, 378 U.S. 184, 188, 84 S.Ct. 1676, 1679, 12 L.Ed.2d 793 (1964). Mr. Justice Brennan explicitly declared that "this Court cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected." Id. at 190, 84 S.Ct. at 1679. He added that "[t]his is precisely what the Court did in Times Film Corp v. City of Chicago, 355 U.S. 35 [78 S.Ct. 115, 2 L.Ed.2d 72]; One, Inc. v. Olesen, 355 U.S. 371 [78 S.Ct. 364, 2 L.Ed. 2d 352]; and Sunshine Book Co. v. Summerfield, 355 U.S. 372 [78 S.Ct. 365, 2 L.Ed.2d 352]." Id. at 190, n. 6, 84 S.Ct. at 1679. In examining the material in Times Film, the Supreme Court did not yield in its judgment to the Chicago Police Commissioner and persons appointed by him to inspect the film, "The Game of Love," a District Court judge, and the Court of Appeals for the Seventh Circuit, which found that "the calculated purpose * * * and its (the film's) dominant effect, are substantially to arouse sexual desires." 244 F.2d 432, 436 (7th Cir. 1957). In One, Inc., the Postmaster, a district judge and the Court of Appeals for the Ninth Circuit had determined that the homesexual magazine "One" had "a primary purpose of exciting lust, lewd and lascivious thoughts and sensual desires in the minds of the persons reading it," 241 F.2d 772, 778 (9th Cir. 1957). And in Sunshine Book, the Postmaster, a Hearing Examiner, the Department Solicitor, the District Court and five out of eight judges on the Court of Appeals for the D.C.Circuit found a "nudist" magazine to come within the proscription of the statute. 101 U.S.App.D.C. 358, 249 F.2d 114 (1957). Thus, the Court has definitely accepted the responsibility of being the final arbiter and has refused to accept the judgments of officials, judges or juries to the contrary. The "sufficient evidence" test on review advocated by the Chief Justice has not been adopted. See Jacobellis v. State of Ohio, supra, 378 U.S. at 190, n. 6, 84 S.Ct. 1676 (dissenting opinion). The burden on this court at this appellate stage should be no less. And the enlarged judicial function in this area requires that we consider the proof or lack thereof and the manner in which the case was placed before the jury, not just whether the material could possibly be brought within the range of the so-called "obscenity" statute. What, then, upon review, does this record disclose?

The Government rested its case largely on a showing of the exhibits themselves insofar as proof of the "obscene" nature of the Nutrix materials was concerned. As for those exhibits, we need add little to what we have already said. It may be conceded that the "sado-masochistic" trash disseminated by Nutrix is not artistic or aesthetically pleasing. Nor is any claim made that it has any redeeming literary or social value whatsoever; it is difficult to imagine such a claim being made, at least on traditional grounds. But cf. People v. Birch, 40 Misc.2d 626, 243 N.Y.S.2d 525 (Sup.Ct. 1963).

As for the statute involved, it is hardly a model of drafting precision or clarity. Section 1461 and the subsequent sections of the "obscenity" chapter are regret-

tably short on terminological and grammatical consistency. Thus, section 1461,[3] which is entitled "Mailing obscene or crime-inciting matter," refers in one part to matter that is "obscene, lewd, lascivious, indecent, filthy or vile" ; the other part, dealing generally with abortion and conception prevention, refers to "indecent or immoral" uses and purposes.[4] For section 1461 only "indecent"

3. Section 1461 provides in full:
Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance; and—
Every article or thing designed, adapted, or intended for preventing conception or producing abortion, or for any indecent or immoral use; and
Every article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for preventing conception or producing abortion, or for any indecent or immoral purpose; and
Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of such mentioned matters, articles, or things may be obtained or made, or where or by whom any act or operation of any kind for the procuring or producing of abortion will be done or performed, or how or by what means conception may be prevented or abortion produced, whether sealed or unsealed; and
Every paper, writing, advertisement, or representation that any article, instrument, substance, drug, medicine, or thing may, or can, be used or applied for preventing conception or producing abortion, or for any indecent or immoral purpose; and
Every description calculated to induce or incite a person to so use or apply any such article, instrument, substance, drug, medicine, or thing—
Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.
Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, or knowingly takes any such thing from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense, and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter.
The term "indecent", as used in this section includes matter of a character tending to incite arson, murder, or assassination.

4. The third group of 41 counts (reduced to 30) against Klaw were apparently based on the part of § 1461 declaring nonmailable, and thus unlawful to use the mails for circulating or disposing of, certain circulars, advertisements and notices giving information about "obscene" matters. The basis of these counts would seem to be a combination of the first and fourth paragraphs of § 1461. However, it is not entirely clear on the face of the statute that the fourth paragraph is at all related to the first—the only one mentioning "obscene"—being rather just a part of the second through sixth paragraphs, which deal throughout with abortion and conception prevention and other indecent or immoral uses. For example, in § 1462, relating to transportation by common carrier, "obscene" books and the like are dealt with in subsection (a), "obscene" recordings and the like are dealt with in subsection (b), and subsection (c) deals only with abortion and conception prevention items and material giving information about such items. The statutory development shows that substantially the present wording of § 1461 was first enacted in Act of July 12, 1876, ch. 186, 19 Stat. 90. The text was cast in its present paragraphed form by the 1948 revision of the criminal code, ch. 768, 62 Stat. 768. The predecessor of § 1462 was Act of February 8, 1897, ch. 172, 29 Stat. 512, which was cast in a form similar to the predecessors of § 1461. Explicit paragraphs and subsections did not appear until Act of May 27, 1950, ch. 214, 64 Stat. 194. However, given our disposition of the case we need not determine whether § 1461 applies to circulars giving information about "obscene" matter, as opposed to simply matters, articles and things "for preventing conception or producing abortion, or for any indecent or immoral use." Moreover, the Court in Roth implicitly assumed, without discussion, that it did. See also the discussions in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 500–518, 520–524, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962).

is specifically defined to include matter "tending to incite arson, murder, or assassination." Section 1462,[5] entitled "Importation or transportation of obscene matters" refers to certain matters that are "obscene, lewd, lascivious or filthy" (but not "vile") or of "indecent" character, as well as "indecent and immoral" uses (again, in a subsection relating to abortion and conception prevention). Section 1463,[6] entitled "Mailing indecent matter on wrappers or envelopes" refers to "indecent, lewd, lascivious, or obscene" (but not "filthy," "vile," or "immoral") delineations and epithets. Section 1464,[7] entitled "Broadcasting obscene language," refers to "obscene, indecent, or profane" (but not "lewd," "lascivious," "filthy," "vile," or "immoral") utterances. Lastly, section 1465,[8] entitled "Transportation of obscene matters for sale or distribution"

---

5. Section 1462 provides in full:

Whoever brings into the United States, or any place subject to the jurisdiction thereof, or knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—

(a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character; or

(b) any obscene, lewd, lascivious, or filthy phonograph recording, electrical transcription, or other article or thing capable of producing sound; or

(c) any drug, medicine, article, or thing designed, adapted, or intended for preventing conception, or producing abortion, or for any indecent or immoral use; or any written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, how, or of whom, or by what means any of such mentioned articles, matters, or things may be obtained or made; or

Whoever knowingly takes from such express company or other common carrier any matter or thing the carriage of which is herein made unlawful—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter.

6. Section 1463 provides in full:

All matter otherwise mailable by law, upon the envelope or outside cover or wrapper of which, and all postal cards upon which, any delineations, epithets, terms, or language of an indecent, lewd, lascivious, or obscene character are written or printed or otherwise impressed or apparent, are nonmailable matter, and shall not be conveyed in the mails nor delivered from any post office nor by any letter carrier, and shall be withdrawn from the mails under such regulations as the Postmaster General shall prescribe.

Whoever knowingly deposits for mailing or delivery, anything declared by this section to be nonmailable matter, or knowingly takes the same from the mails for the purpose of circulating or disposing of or aiding in the circulation or disposition of the same, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

7. Section 1464 provides in full:

Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both.

8. Section 1465 provides in full:

Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

The transportation as aforesaid of two or more copies of any publication of two or more.of any article of the character described above, or a combined total of five such publications and articles, shall create a presumption that such publications or articles are intended for sale or distribution, but such presumption shall be rebuttable.

When any person is convicted of a violation of this Act, the court in its judgment of conviction may, in addition to the penalty prescribed, order the confiscation and disposal of such items described herein which were found in the possession or under the immediate control of such person at the time of his arrest.

refers to matter that is "obscene, lewd, lascivious, or filthy" (but not "vile" or "profane") or of "indecent or immoral" character. Thus, as the chapter heading suggests, all five sections are concerned with "obscene" matter. They also each mention "indecent," but apply it variously to "character," "use" and "purpose." The other terms—"lewd," "lascivious," "filthy," "vile," "immoral" and "profane" —are used only sporadically.

 It should not be surprising, then, that the results of judicial attempts to apply these and similarly worded statutes consistently with the First Amendment have produced strange results. The broad freedom of expression so preferentially protected by the First Amendment, cf. United States v. Carolene Prods. Co., 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), has been found to have an exceptional enclave for "obscenity." The varied and vague terms in such statutes are often subsumed within the one term "obscene" which is found throughout the federal law. Indeed, "it is doubtful whether any standard other than obscenity could stand the Constitutional test." People v. Brooklyn News Co., 12 Misc.2d 768, 771, 174 N.Y.S.2d 813, 817 (Kings County Ct. 1958) (Sobel, J.); cf. United States v. Keller, 259 F.2d 54 (3d Cir. 1958). See also People v. Mishkin, 26 Misc.2d 152, 154, 207 N.Y.S.2d 390, 393 (Ct.Spec.Sess. 1960), aff'd as modified, 17 A.D.2d 243, 234 N.Y.S.2d 342 (1st Dept. 1962), aff'd, 15 N.Y.2d 671, 255 N.Y.S.2d 881, 204 N.E.2d 209 (1964), probable jurisdiction noted, 380 U.S. 960, 85 S.Ct. 1103, 14 L.Ed.2d 152 (1965) (No. 858, 1964 Term, renumbered No. 49, 1965 Term). See also Friedman v. New York, 34 U.S.L. Week 3014 (New York Sup.Ct., Jan. 21, 1965), petition for cert. filed, 33 U.S.L. Week 3369 (U.S. May 13, 1965) (No. 1161, 1964 Term; renumbered No. 135, 1965 Term). We must take great care, therefore, to see that limitations on materials regarded as "obscene" have no more scope than is necessary to effectuate the permissible purposes of such constraints. Cf. Butler v. State of Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957).[9]

 We do not doubt that "obscenity" may be regulated because it is thought to incite antisocial sexual behavior and crime. "Obscene" material and conduct may also sometimes be suppressed and penalized because, like a common law nuisance, it constitutes an unreasonably offensive intrusion into the lives of persons who cannot reasonably

---

9. While knotty problems are raised if one considers the religious background of many of these laws, see Henkin, Morals and the Constitution: The Sin of Obscenity, 63 Colum.L.Rev. 391 (1963), they need not be dealt with if permissible secular purposes and justifications may be found for them. Cf. McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Two Guys from Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961). Compare Griswold v. State of Connecticut, 85 S.Ct. 1678 (1965). While contemporary secular support is being found for proscription of words, thoughts and scenes that were inconsistent with "religious" conceptions, so too has the content of those conceptions itself been changing. Thus, descriptive words fit for one generation of translators of the Bible are unfit for another. See, e. g., Adams, The Magic and Mystery of Words 68 (1963). Similarly, in a stimulating article, Reverend Howard Moody has re-

cently questioned the whole religious approach to obscenity. Moody, Toward a New Definition of Obscenity, 24 Christianity & Crisis 284 (1965). Noting that "from a theological or ethical perspective, 'dirty words' are a terribly inadequate base from which to write a definition of obscenity," id. at 286, he suggests that our standard of obscenity is "obsessed with sex and vulgar language; * * * [it should be] defined rather as that material which has as its dominant theme and purpose the debasement and depreciation of human beings—their worth and dignity." Id. at 287. If at the same time as the restrictions on publication have been loosened the nation has approached "a state of moral decadence, * * * the evidence of this is not to be found in salacious literature, erotic art or obscene films but in the 'soul-rot' that comes from the moral hypocrisy of straining at the gnat of sexuality and swallowing the camel of human deterioration and destruction." Id. at 288.

avoid it. Other reasons for proscription are more troublesome, such as when the "obscenity" might merely be thought to cause sexual or other stimulation or excitement—unrelated to otherwise deleterious behavior—for willing adults who would not be subject to the material if they did not want to be. Also troublesome is regulation of "obscenity" simply because it reflects sexual values differing from current majority morals, cf. Kingsley Int'l Pictures Corp. v. Regents of the University of the State of New York, 360 U.S. 684, 688–689, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959). See generally Henkin, Morals and the Constitution: The Sin of Obscenity, 63 Colum.L.Rev. 391, 392–95 (1963); Kalven, The Metaphysics of the Law of Obscenity, in 1960 Supreme Court Review, 1, 3–4 (Kurland ed.).

■ However, in considering the permissible meaning of "obscene" in section 1461, we must begin with the Supreme Court's treatment of that statute in Roth. That case contains the oft-quoted—although difficult to apply—statement that material is "obscene" if: "to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U.S. at 489, 77 S.Ct. at 1311.[10]

In addition to its appeal to "prurient interest," proscribable "obscenity" must be "utterly without redeeming social importance." Roth v. United States, supra, 354 U.S. at 484, 77 S.Ct. 1304; Jacobellis v. Ohio, 378 U.S. at 191, 84 S.Ct. 1676. It must go "substantially beyond the customary limits of candor in description or representation." Ibid. (quoting American Law Institute, Model Penal Code formulation also quoted in Roth, 354 U.S. at 487 n. 20, 77 S.Ct. at 1310). It must be characterized by "patent offensiveness." Manual Enterprises, Inc. v. Day, 370 U.S. 478, 482, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962). In brief, it is "hard-core pornography." Jacobellis v. Ohio, supra, 378 U.S. at 197, 84 S.Ct. 1676.

■ Thus, material is proscribable "obscenity," or hard-core pornography, if it has the requisite prurient appeal, *and* if it so exceeds customary candor as to be patently offensive, *unless* it has *any* redeeming social importance. The last requirement is part of the broad protective mantle of the First Amendment. But, as counsel for defendants repeatedly emphasized, there is no claim in this case that the Nutrix materials have any redeeming social importance. However, the absence of artistic or literary value or other value of social consequence does not, without more, lead to a finding of

10. A problem not discussed in Roth, but initially raised in this case, is whether the standard is any different if the typical potential recipient of the "obscene" material may be someone other than the "average man," i. e., a member of a particular group such as a sexual deviate. In Manual Enterprises, Inc. v. Day, 370 U.S. 478, 481–482, 82 S.Ct. 1432, 8 L. Ed.2d 639 (1962), Justices Harlan and Stewart indicated that the question of the relevant audience was still open, but they did not feel compelled to reach it.

We realize that the Court went on in Roth to quote with approval a charge that "[t]he test in each case is the effect of the book, picture or publication considered as a whole, not upon any particular class, but upon all those whom it is likely to reach. In other words, you determine its impact upon the average person in the community." 354 U.S. at

490, 77 S.Ct. at 1312. But this brief treatment can hardly be taken as ending the matter. When read in light of the familiar admonition (contained in the same charge) that the reactions of the young, the immature, the prigs, or the highly prudish are not decisive, this passage need mean little more than that putatively "obscene" matter more or less directed to or likely to reach all parts of the community must be appraised on those terms, and not on the basis of its appeal to a small segment of the community. Because there may be good reason for proscribing material that is more likely to reach and be responded to in a prurient way by a deviant segment of the community, we are not convinced that prurient appeal to the average member of the community is the only possible standard.

proscribable "obscenity." Such qualities would merely insulate what might otherwise be proscribable due to its offensiveness and prurient appeal. See, e. g., Larkin v. G. P. Putnam's Sons, 14 N.Y.2d 399, 252 N.Y.S.2d 71, 200 N.E.2d 760 (1964) (the novel "Fanny Hill"); People v. Bruce, 31 Ill.2d 459, 202 N.E.2d 497 (1964) (satirical monologist); Goldman, The Comedy of Lenny Bruce, 36 Commentary 312 (1963); cf. People v. Birch, supra. But cf. People v. Bruce, unreported, Crim.Ct. City of New York, 1964 (appeal pending); Attorney General v. Book Named "John Cleland's Memoirs of a Woman of Pleasure," Mass., 206 N.E.2d 403 (1965). Compare United States v. Ginzburg, 338 F.2d 12, 14 (3d Cir. 1964), cert. granted, 380 U.S. 961, 85 S.Ct. 1103, 14 L.Ed.2d 152 (1965) (No. 807), 1964 Term, renumbered No. 42, 1965 Term.

■ Nor is mere "patent offensiveness" enough. There must in addition be the requisite prurient appeal. Assuming that "prurient appeal" can be adequately defined, there are still some questions: appeal to whose prurient interest? judged by whom? on what basis? For example, is it the "average person" who applies "contemporary community standards" to determine if the "dominant

theme" appeals to "prurient interest" (of someone)? Or is it someone else applying "contemporary community standards" to determine that the "dominant theme" appeals to "prurient interest" of the "average person" ? Do "contemporary community standards" operate to reduce potential prurient appeal? Or do they operate to establish that some "redeeming social importance" is present? Or, do they operate to measure the "patent offensiveness" of an excess of candor? Again, does the "dominant theme" indicate that the prospective prurient appeal is great or slight? Or does it suggest that other themes will supply the redeeming social importance? Perhaps the Roth statement is too compact—an unsurprising failing in an initial formulation; the Court itself has acknowledged that it "is not perfect." Jacobellis v. Ohio, supra, 378 U.S. at 191, 84 S.Ct. 1676. But the difficulties of articulating an adequate substitute need not dictate immutable adherence to such a will-o'-the-wisp.[11]

■■ Having in mind the constitutional constrictions on the breadth of legislation affecting the freedom of expression, if appeal to prurient interest— on either an "average man" or a "deviant typical recipient" basis—is the statutory

11. In this case it is the first of these ambiguities that is most bothersome—that is, appeal, if any, to whose prurient interest, judged by whom, and on what basis. Before, during, and at the end of the trial, and now on appeal, the Government's claim has been that the familiar Roth test does not require that the material appeal to the average person. "All that it requires is that the dominant theme of the material—that is, the dominant nature of such appeal as it has—be recognizable to the average person as being an appeal to prurient interest." But in so restating Roth, the Government has merely chosen one of several approaches to determination of the requisite prurient appeal, one that does not say to whose prurient interest the appeal must go. Another approach is to say that the material must be shown to appeal to the prurient interest of the "average person" (a close cousin to the "reasonable man" whose assumed existence cannot be questioned lest

many a legal edifice become a mere house of cards). Since the "average person" is almost always a possible recipient, even if not the typical recipient, the effect on him or her would always seem important. After all, the prurient appeal element is presumably related to the deterrence purpose. And without now questioning the apparent legislative assumption that stimulation of prurient interest leads to significant anti-social behavior, but cf. United States v. Roth, 237 F.2d 796, 804, 812–817 (2d Cir. 1956), aff'd, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), if the prurient interest of the average person is stimulated there may be cause for regulation. There may also be cause for regulation of material that stimulates the prurient interest of, not the average person, but the abnormal person—the deviate—who is likely to be its typical recipient. Indeed, there may be even more cause for regulation.

concern, then it seems desirable, indeed essential, that such appeal to someone be shown to exist. This the Government's view of Roth does not require. Nor should it be sufficient merely that the disseminator or publicizer thinks such appeal exists. The stimulation and reaction with which the "obscenity" laws are concerned are unlikely to be a problem if the appeal is felt by none of the recipients, but only by the disseminator. While such a person may in some other ways be a potential problem for society, the "obscenity" laws do not seem best calculated to cope with him. Moreover, the Court stresses in Roth the "effect" of the material on the people reached by it. See 354 U.S. at 490, 77 S.Ct. 1304.[12]

■■■■ Of course, we are not asked to decide that Nutrix materials can in no case be a proper basis for exclusion from the mails nor, for that matter, for criminal convictions. Exclusion has already been decided. But while this discussion would be quite relevant to whether particular material alleged to be "obscene" may possibly be found to be beyond the scope of the First Amendment, it is also of central importance to the main problem in this case, which is one of proof and conviction. And if proof of prurient stimulation and response is generally important, it is particularly necessary when the prurient interest may be that of a deviant segment of society whose reactions are hardly a matter of common knowledge. It may well be that there are characters and cults to which exaggerated high heels, black patent leather bindings and bondage poses have some occult significance, but we doubt that any court would take judicial notice of the reaction that deviates—or the average man— might have to such stimuli. However, some proof should be offered to demonstrate such appeal, thereby supplying the fact-finders with knowledge of what appeals to prurient interest so that they have some basis for their conclusion. As was observed earlier in Klaw's troubles with the postal censors, "obviously, the issue of what stirs the lust of the sexual deviate requires evidence of special competence." Klaw v. Schaffer, supra, 151 F.Supp. at 539 n. 6; see Manual Enterprises, Inc. v. Day, 110 U.S.App.D.C. 78, 289 F.2d 455 (1961, rev'd, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962)).

In this case, although Judge Wyatt wisely suggested, and the Government considered, introduction of such evidence, there was none. Because of this Judge Wyatt stated at the end of the case, as he had to, that there was no "evidence from which the jury could find that it [Nutrix materials] would in fact appeal to the prurient interest of a particular class."

Furthermore, nothing in the record shows that the material even has prurient appeal to the average man. The parent witnesses did not react to Junior's new literary and pictorial delights in a prurient manner, nor did the other recipient witnesses. Junior was not called upon to describe the appeal (if any) to his prurient interest; he probably would not have understood what "prurient" meant any more than do his elders. Most of the witnesses testified that they found the material disgusting or revolting, but that lascivious and lecherous thoughts had not been aroused in them. It is

12. It might be thought that the statute in question is concerned not so much with deterrence of sexually stimulated antisocial conduct as with use of the mails to disseminate unsolicited, undesired offensive materials to uninterested recipients. But the statute is not so narrowly drawn. Indeed, a bill more appropriately designed to cope with that precise problem was recently approved by the House of Representatives. The bill, H.R. 980, 89th Cong. 1st Sess., would permit a recipient or a parent of an infant recipient to return to his Postmaster any mail thought by the recipient to be "obscene, lewd, lascivious, indecent, filthy or vile" and have the Postmaster notify the sender to discontinue the mailings; such an order would be judicially enforceable. Cf. Lamont v. Postmaster General, 85 S.Ct. 1493, 1495, n. 2 (1965). See generally Schwartz, The Mail Must Go Through—Propaganda and Pornography, 11 U.C.L.A. L.Rev. 805, 845–48 (1964).

not unlikely that many if not most witnesses and jurors would also consider "disgusting and revolting" more than a few of our current motion pictures, like "Dr. Terror's House of Horrors," many of the newsstand magazines so anomalously entitled "horror comics," the risque birthday, convalescent, and greeting cards found in almost every corner drug store, as well as the scores of vulgar party favors. Indeed, vulgarity seems to be in vogue. But it is doubtful whether our jails would be well used if convictions were to be based on material that is just "disgusting and revolting." To do so would, we fear, be simply another application of the age-old double standard of the drawing room and the locker room.

■ If the witnesses presented in this case provide any sampling, these pamphlets and pictures stimulated no one's prurient interest. Although it may be difficult to find expert and other witnesses properly qualified to inform the jury about what does or does not appeal to the prurient interest of the average person, cf. Klaw v. Schaffer, supra, 151 F.Supp. at 539–540, it would not seem impossible. On the other hand, it is clear that jurors should not consider their own personal reactions as setting the standard; there is too much truth in the observation that "what is pornography for one man is the laughter of genius to another." [13] Cf. Ass'n of the Bar of the City of New York, Comm. on the Bill of Rights, Report on H.R. 319, 88th Cong., 2d Sess. (1964), on "Morally Offensive Mail," in Reports of the Ass'n of the Bar Concerned with Federal Legislation 54, 56 (1965).

In this case, however, the only predicate for any conclusion about prurient appeal was the material itself, as if *res ipsa loquitur*. The jurors were, therefore, left to speculate. They were invited to behold the accused material and, in effect, conclude simply that it is unde-sirable, it is distasteful, it is disgusting. Knowing perhaps that they would not be interested in obtaining more of the material they might wonder why anyone else would, and conclude that the only answer is "prurient appeal." Because the jury was given no basis for understanding exactly how and why the material appeals to its audience, whether deviate or average person, it may too readily supply an explanation—"prurient appeal." Even if the jury did not consist of twelve carefully selected Anthony Comstocks, it might well believe that the predominant appeal of certain acknowledged works of art, sculpture and literature found in all our well-known museums and libraries would be to the prurient interest of the average person, or perhaps someone else. But if that be so, can we allow the censor's stamp to be affixed on the basis of an uninformed jury's misconceptions? See also Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

Whatever the value of mere "autoptical" evidence in other contexts, it should not readily be countenanced in this area. Otherwise, too easily the Government's test might allow a jury to equate patent offensiveness to prurient appeal, thus obliterating the conjunction that has been thought indispensable. See e. g., Manual Enterprises, Inc. v. Day, supra, 370 U.S. at 482, 82 S.Ct. 1432; Jacobellis v. State of Ohio, supra, 378 U.S. at 191–192, 84 S.Ct. 1676. Too easily the jury could aid suppression simply on the basis of speculations and suspicions about the prurient appeal of material to some unknown, undefined person whose psyche is not known. With the First Amendment in the background, this cannot be abided.

■ The state of the record gave the jurors impermissibly broad freedom to convict just because, having no more informative evidence than the material itself, they might think that the average person would "recognize" that the material has prurient appeal. But again, *to*

13. D. H. Lawrence, Pornography and Obscenity, in Sex Literature and Censorship, 69 (Moore ed. 1953).

*whom?* In this case, the jury had insufficient evidence even to "recognize" that the material appealed to the prurient interest of the average person. It had absolutely no evidentiary basis from which to "recognize" any appeal to the prurient interest of the deviate or the typical recipient—a class never really defined in the record. Because there was insufficient evidence for the jury to consider Nutrix material "obscene" under any proper view of the Roth test, the motion for directed verdict of acquittal should have been granted.[14]

This result demonstrates perhaps that a second pronouncement may now be needed to clarify the rule of Roth. However, this court is mindful of the difficulties of providing an adequate definition, and it may turn out that the best and most realistic formulation available is that of Mr. Justice Stewart in Jacobellis that it is only "hard-core pornography" to which the Constitution's protection does not extend, and although it may be indefinable, "I know it when I see it * * *." 378 U.S. at 197, 84 S.Ct. at 1683. In any case, following Roth the censor's disapproving seal was removed from magazines for homosexuals and pictures of nudist camps in which the campers are unemasculated by the censor's retouching brush. Through these and other breaches in the dike has swept a veritable flood, as each pamphlet, play or picture seems obliged to be even more candid or daring in order to stimulate the public's prurient palate and assure appearance on the best-seller list. Authors vie with each other to peer through keyholes and over transoms, and to hide themselves at advantageous listening posts in well-selected bedrooms. Their efforts are rewarded by their being able to depict sights and conversations concerning the most intimate phases of sexual activity, with or without the benefit of wedlock. Witness such books as "The Group," "Candy," and "Green Tree in Gedde," the last of which the reviewer in the stately New York Times says is "a mixture of existentialism and erotic prurience" apparently demonstrating "that young people in our tormented civilization are so lost in a wilderness of moral anarchy and philosophical despair that their only interest is in sex and in many of its most debased and perverted manifestations." May 3, 1965, p. 31, col. 3. And the commercial attributes of sexual candor have apparently not gone unnoticed by publishers of even the women's magazines. See Iversen, The Pious Pornographers (1965).

A comparison of judicial reactions to recent *causes célèbres* suggests that the judiciary in our tormented modern civilization are also lost in a wilderness. Before it obtained its imprimatur in Grove Press, Inc. v. Gerstein, 378 U.S. 577,

---

14. Even with adequate proof under the average man test, there might still be problems, for the jury was charged to consider the material from the standpoint of the average man in the nation as a whole. We very much doubt whether twelve random New Yorkers can make such a judgment without being further informed about the "common conscience of the nation," if there be such a thing. In any case, we do not read the Court's plurality opinions in Jacobellis as unequivocal authority for the proposition. In announcing the Court's judgment, Justice Brennan was speaking only for himself and Justice Goldberg. Justices White, Black and Douglas concurred only in the judgment. Justice Stewart concurred without indicating adoption of the national community standard. As for the dissenters, the Chief Justice explicitly rejected the national standard, as did Justice Harlan, presumably in light of his views in Roth. See Gent v. State, Ark., 393 S.W.2d 219 (1965). See also Keney v. New York, 34 U.S.L. Week 3011 (New York, Monroe County Ct., 1964), petition for cert. filed, 33 U.S.L. Week 3231 (U.S. Dec. 29, 1964) (No. 793, 1964 Term; renumbered No. 39, 1965 Term); Redrup v. New York, 34 U.S.L. Week 3012 (New York, Sup.Ct., Dec. 17, 1964), petition for cert. filed, 33 U.S.L. Week 3341 (U.S. March 26, 1965) (No. 1073, 1964 Term; renumbered No. 72, 1965 Term).

84 S.Ct. 1909, 12 L.Ed.2d 1035 (1964). Henry Miller's "Tropic of Cancer" was "obscene" in Florida and in New York, People v. Fritch, 13 N.Y.2d 119, 243 N.Y.S.2d 1, 192 N.E.2d 713 (1963), but not in California, Zeitlin v. Arnebergh, 59 Cal.2d 901, 31 Cal.Rptr. 800, 383 P.2d 152, cert. denied, 375 U.S. 957, 84 S.Ct. 445, 11 L.Ed.2d 315 (1963), Massachusetts, Attorney General v. Book Named "Tropic of Cancer," 345 Mass. 11, 184 N.E.2d 328 (1962), and Wisconsin, McCauley v. Tropic of Cancer, 20 Wis.2d 134, 121 N.W.2d 545 (1963). Similar confusion and inconsistency is being manifested as to "Fanny Hill," which is "obscene" in Massachusetts, Attorney General v. Book Named "John Cleland's Memoirs of a Woman of Pleasure," Mass., 206 N.E.2d 403 (1965), but not in New York, Larkin v. G. P. Putnam's Sons, 14 N.Y.2d 399, 252 N.Y.S.2d 71, 200 N.E.2d 760 (1964). This is a book which any layman might not hesitate to say met all the requirements of Roth. The most amateur prosecutor could undoubtedly obtain a conviction in any part of the country in comparatively few minutes merely by reading a few pages to the jury. In fact, the same prosecutor might obtain the same result if he exhibited to the jury those glossy prints (mailed in plain envelopes) of quite naked ladies in various poses, despite the fact that they were photographs of famous pictures or statues in art museums. The possibility that deliberating jurors would be uncommonly sanctimonious or hypocritical seems quite obvious. Indeed, most if not all of the censor's defeats have come at the hands of appellate courts, and not the jury.

Many would doubt that a judicial system that puts its permissive stamp of approval upon such books as "Tropic of Cancer" and "Fanny Hill," to name a few, or certain magazines for homosexuals and sunbathers should then incarcerate or penalize these two defendants for disseminating and publicizing material which might or might not (there is no proof) appeal to someone's "prurient interest." Indeed, we can sympathize with Klaw's plight were he to find "Fanny Hill" or "Tropic of Cancer" in the prison library, or, if others had pre-empted the only copies, there were available "Pleasure Was My Business," see Tralins v. Gerstein, 378 U.S. 576, 84 S.Ct. 1903, 12 L.Ed.2d 1033 (1964), which contains "numerous descriptions of abnormal sex acts and indecent conversations supposed to have taken place in [a] Florida brothel." As Chief Judge Desmond pointed out in his dissent in Larkin, "Fanny Hill" contains every element which might appeal to "prurient interest." Judge Scileppi described the book, with considerable justification, as "one of the foulest, sexually immoral, debasing, lewd and obscene books ever published, either in this country or abroad." Larkin, supra, 14 N.Y.2d at 407, 252 N.Y.S.2d at 78, 200 N.E.2d at 765. If no books are available, Klaw together with the public might turn to stimulation through the auditory nerves rather than the optic nerves. The field is no less fruitful for now "Fanny Hill Comes Alive" in an unexpurgated two-record album, giving in 16 stunning scenes "all the lusty, intimate, climatic excitement of this erotic masterpiece * * * Banned for 200 years, now available following New York State Court of Appeals decision overruling the lower courts." So reads the advertising in the Book Review section of a recent Sunday New York Times, April 4, 1965. Thus, another item is added to the party-record list which for generations has delighted those who seek such entertainment with their lusty and ribald old English ballads, entertainment to which Robert Burns, to name one, was a not insubstantial contributor. And in the field of prose, see Mark Twain's "1601" and Samuel Pepys' "Diary." [15] Faced with this vast array of reading and listening matter available to the public, Klaw might un-

15. Seen generally Kronhausen & Kronhausen, Pornography and the Law, 43–56, 79–92 (1959).

derstandably wonder as to the meaning of equal protection of law.

In judging the convictions of Klaw and Kramer against the many decisions of the Supreme Court and highest state courts, this court has been left with the definite impression, as indicated above, that there has been insufficient proof presented in this case to justify their penalties and imprisonment. For better or for worse, the standard of what does not arouse "prurient interest" has been established. A particularly careful study of the subject matter involved in this and other cases has been made because this court regards the material as revolting and disgusting. But it is the record and not our feelings that must control. Here the jury had no opportunity to judge the exhibits presented to them by any standard other than their own speculation as to "prurient interest." If they knew the standard set as a matter of law by other cases, their result might have been different. "Due process of law" would be a meaningless cliche if the nonsensical trash that is the subject of this prosecution were allowed to be the basis of a conviction by judge or jury without any proof demonstrating that it has the proscribed effect on any of our citizenry.

The courts may have opened the floodgates for horror and filth, but if they are to be closed it should be done by the careful drafting of proper laws by our duly elected representatives, and not by a combination of zealous governmental inspectors, prosecutors, and uninformed juries. Then the potential contributors to our culture may have some slight notion of the guidelines and the risks. Of course, it is quite possible that after the public is sated with the products of the new permissiveness the floodtide will ebb of its own diminished momentum. Until then, however, the responsibility of protecting defendants from unguided suppression and conviction weighs as heavily upon this court as it does upon the Supreme Court. While there is some merit to the opinion of those who say that appellate courts should not have to sit as a board of censors supervising the work of the police, the motion picture censorship bureaus, the schools, the churches, and the other organizations that have their lists of good and bad books and motion pictures, there is even more merit to the view that once these preferences are enforced upon others, we "cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected." Jacobellis, supra, 378 U.S. at 190, 84 S.Ct. at 1679. Unless there be this protection, a witch hunt might well come to pass which would make the Salem tragedy fade into obscurity. Having in mind the alternatives of jail or freedom, courts must be aware of the facts of the "held-not-to-be-obscene" or "approved" cases, and ensure that the proof is sufficient to allow a fact finder to set this case apart from them. Otherwise it would be altogether too easy for any prosecutor to stand before a jury, display the exhibits involved, and merely ask in summation: "Would you want your son or daughter to see or read this stuff?" A conviction in every instance would be virtually assured.

Finally, to take Mr. Justice Brennan's concluding words in reversing the court below in Jacobellis v. State of Ohio, supra, 378 U.S. at 196, 84 S.Ct. at 1682: "We have viewed the film [the exhibits], *in the light of the record made in the trial court,* and we conclude that it is [they are] not obscene within the standards enunciated in Roth v. United States and Alberts v. California * *." and implicit in the many other decisions of the Supreme Court. (Emphasis added.)

Reversed.