WAYNE COUNTY PROSECUTOR *v.* DOERFLER

1. Trial—Disqualification of Trial Judge—Bias—Appeal and Error.

Membership of trial judge in a Catholic laymen's organization which worked closely with the National Office for Decent Literature to prevent distribution of obscene literature to children, and his public statements and appearances on behalf of this effort, *held,* not grounds for disqualification of the judge because of bias in the trial of a civil action by the county prosecutor to enjoin defendant from distributing certain allegedly obscene publications when the statements of the trial judge were no more than general public statements designed to educate the community and when the trial judge had tempered his remarks and noted that he was not attacking any particular publication.

2. Same—Continuance of Proceedings—Influence of News Coverage—Effect on Fairness of Trial.

Denial by trial court of defendant's motion for a reasonable continuance of a trial in which the county prosecutor sought to enjoin defendant from distributing allegedly obscene magazines after a local television station had during the week before the

---

References for Points in Headnotes

[1] 53 Am Jur, Trial § 74 *et seq.*
[2] 53 Am Jur, Trial §§ 35, 991.
[3, 4, 6–8] 33 Am Jur, Lewdness, Indecency and Obscenity §§ 9, 10, 20, 21.
[10, 13, 14] Constitutionality of federal and state regulation of obscene literature—federal cases. 1 L Ed 2d 2211. Modern concept of obscenity. 5 ALR3d 1158.
[5] 30 Am Jur, Judgments § 324 *et seq.*
Conviction or acquittal as evidence of the facts on which it was based in civil action. 18 ALR2d 1287.
[9] 31 Am Jur 2d, Expert and Opinion Evidence §§ 20–22.
[11] 5 Am Jur 2d, Appeal and Error § 891 *et seq.*
[12] 47 Am Jur, Search and Seizure § 52 *et seq.*
Admissibility, in civil case, of evidence obtained by unlawful search and seizure. 5 ALR3d 670.
Lawfulness of seizure of property used in violation of law as prerequisite to forfeiture action or proceeding. 8 ALR3d 473.

trial broadcast a series of admittedly one-sided programs purporting to be an exposé of smut literature being sold in the area and had during one of the programs interviewed counsel for plaintiff and had shown examples of what it considered to be smut literature and had broadcast an editorial urging citizens to join the crusade against smut literature, and denial of defendant's motion for a mistrial after the trial judge had appeared on the same television station to explain his denial of the motion for continuance, *held*, proper where on *voir dire* 11 jurors stated that they had not seen the programs and the one juror who did see the programs stated that he did not remember their content.

3. OBSCENITY—STANDARD USED IN DETERMINATION—CONTEMPORARY COMMUNITY STANDARDS.

One of the tests for determining whether or not a publication is obscene is the test of whether or not it is offensive under prevailing contemporary community standards.

4. SAME—STANDARD USED IN DETERMINATION—CONTEMPORARY COMMUNITY STANDARDS—DETERMINATION OF STANDARDS.

A jury is itself a small average community for purposes of trial of an obscenity question, and therefore it must make an independent determination of contemporary community standards; but this determination may be aided by allowing jurors to compare the publications in question with those that have been accepted by the community.

5. SAME—CIVIL ACTION TO ENJOIN SALE OF OBSCENE MATTER—EVIDENCE—MATTER PREVIOUSLY HELD NON-OBSCENE IN CRIMINAL TRIAL—RES JUDICATA.

Denial by the trial court of defendant's request to inform the jury of defendant's acquittal at a prior criminal trial for distributing obscene material when some of the same material was introduced in evidence in the present civil action, and denial of his request that the reason for plaintiff's withdrawal from consideration of some of the publications admitted in evidence at this trial be explained to the jury; and granting by the trial court of plaintff's request merely to withdraw those exhibits from evidence, *held*, proper where it was clear that the intent of plaintiff was not to introduce in evidence any of the publications found non-obscene at the previous criminal trial, and that these publications were introduced merely through inadvertence; and where knowledge of the reason for the withdrawal would not—because of the large number of publications in evidence—help the jury form a judgment about those remaining.

6. Same—Evidence—Prurient Interest—Contemporary Community Standards—Burden of Persuasion—Directed Verdict.

Mere presence before the jury of publication upon which the minds of men could differ on the question of obscenity presents a jury question, and the failure of plaintiff to present evidence on what does or does not appeal to prurient interest or what contemporary community standards are does not entitle defendant to a directed verdict, especially where any prurient appeal that might exist is directed primarily at the average male.

7. Same—Evidence—Contemporary Community Stanards—Expert Testimony.

Denial by trial court of defendant's request to present expert testimony on what contemporary community standards of obscenity are, *held*, proper where defendant did not offer any foundation of that type of expertise before he sought to employ his experts.

8. Same—Evidence—Contemporary Community Standards.

Mere showing that certain magazines are present in the local area does not mean that they are tolerated by the average person in the area or that they are not offensive to contemporary community standards.

9. Same—Evidence—Contemporary Community Standards—Expert Testimony—Police Censor.

A censor with the local police department is not such an expert on community standards that he should by his testimony be allowed to influence a jury in determining what is or is not obscene.

10. Same—Effect of Publication on Readers—Age of Readers.

Trial court's instruction to jury in obscenity trial that it was not to consider the effect of the publications in question on children, but that it was for the jury to decide when adulthood began and that at times this was regarded to be as early as 14; *held*, not prejudicial to defendant, because it was necessary for the trial court to inform the jury that they must determine the age of adulthood.

11. Appeal and Error—Trial—Instructions to Jury—Denial of Due Process.

Appellate courts reviewing jury instructions at trial will not engage in speculation and inference to find a violation of constitutional rights that is not clearly apparent.

12. OBSCENITY—DUE PROCESS—UNREASONABLE SEARCH AND SEIZURE.
   Michigan civil obscenity statute permitting the county prosecutor and certain other local officials to bring a civil action to enjoin a person from distributing certain matter alleged to be obscene and *authorizing* seizure and destruction of the matter if it is found obscene does not violate the guarantee against unreasonable search and seizure because there can be no seizure until there is a court finding of obscenity (CLS 1961, § 600.2938).

13. SAME—VALIDITY OF STATUTE—DUE PROCESS—VAGUENESS.
   The term "obscene" is sufficiently definite so that a statute dealing with obscenity is not unconstitutionally vague merely because it uses that term.

14. SAME—TIMELINESS OF ACTION.
   Civil action following seizure of allegedly obscene publications from defendant's warehouse to enjoin their distribution and to obtain an order for their destruction prior to any offer for sale to the public was premature, since a determination of method of sale and distribution is necessary before an allegation of illegal activity can stand.

Appeal from Wayne, Rashid (Joseph G.), J.   Submitted Division 1 March 4, 1968, at Detroit.   (Docket No. 2,579.)   Decided November 29, 1968.

Complaint by Samuel H. Olsen, prosecuting attorney for the county of Wayne, against William Doerfler, and Royal News Company, a foreign corporation, to permanently enjoin distribution by defendants of certain allegedly obscene publications and for an order directing the destruction of those publications.   Verdict for plaintiff.   Defendant appeals.   Reversed.

*William L. Cahalan,* Prosecuting Attorney, and *Aloysius J. Suchy* and *George H. Cross,* Assistant Prosecuting Attorneys, for plaintiff.

*Goodman, Eden, Robb, Millender, Goodman & Bedrosian,* for defendants.

FITZGERALD, J.  A quotation from the plaintiff's reply brief to the defendants' supplemental brief seems particularly appropriate to set the tenor of this appeal, expressing as it does the miasma into which we descend:

"It was once said that the law is a seamless web. The law is nowhere more seamless than in the area of obscenity.  While all courts agree that obscenity is not protected by the first and fourteenth amendments to the Constitution, what is obscene or not obscene has traveled the crooked mile from the exposure of the female ankle which was obscene to the exposure of the male and female genitalia which apparently sometimes is not.  It is not that that which was obscene *per se* has changed but rather interpretation of constitutional rights that have been broadened by the courts to the end that in the final analysis, nothing is impermitted under certain circumstances.  Obscenity is still obscenity.  It is only that obscenity is now permitted, encouraged, and financially rewarded and, therefore, by interpretative innuendo, that which was obscene sometimes appears no longer to be so."

To lighten the burden of the reader, we will not attempt a weary description of the magazines here involved.  A random selection of titles will suffice to present a kaleidoscope of the *genre* we here deal with: *Black Satin, The Body Shop, Busty, Cuddle Bug, Diamond Stud, Frenchy, Hip & Toe, Imp, Man's Favorite Pastime, Masher, Nymph, Pagan, Sultry, Slave, Undie World,* and last but far from least, *Wow!*  Multiply these titles by the prolifera-

tion of other titles and it is not difficult to fathom the spectrum placed before the jury in this action.

Agreed as both bench and bar must be, that the area of obscenity produces as many views as there are legal minds at work,[1] we find that even the statement of facts of this particular appeal produces fundamental divergences as to the true meaning and thrust of this case. To set out the controverted factual situation, we reproduce first the defendants' view, then the plaintiff's, both paraphrased in style, but demonstrating their respective positions:

### STATEMENT OF FACTS BY DEFENDANTS

Defendant Royal News Company is an Ohio corporation engaged in the business of the distribution and sale of books, magazines and periodicals. It operated a warehouse and office in Detroit of which defendant Doerfler was manager.

---

[1] In the 13 obscenity cases since *Roth v. United States* (1957), 354 US 476 (77 S Ct 1304, 1 L Ed 2d 1498), in which a signed opinion was written for the Court, there have been a total of 54 separate opinions among the justices. *Kingsley Books, Inc. v. Brown* (1957), 354 US 436 (77 S Ct 1325, 1 L Ed 2d 1469), four opinions; *Roth v. United States, supra,* four opinions; *Kingsley Pictures Corp. v. Regents* (1959), 360 US 684 (79 S Ct 1362, 3 L Ed 2d 1512), six opinions; *Smith v. California* (1959), 361 US 147 (80 S Ct 215, 4 L Ed 2d 205), five opinions; *Times Film Corp. v. Chicago* (1961), 365 US 43 (81 S Ct 391, 5 L Ed 2d 403), three opinions; *Marcus v. Search Warrant* (1961), 367 US 717 (81 S Ct 1708, 6 L Ed 2d 1127), two opinions; *Manual Enterprises v. Day* (1962), 370 US 478 (82 S Ct 1432, 8 L Ed 2d 639), three opinions; *Bantam Books, Inc. v. Sullivan* (1963), 372 US 58, (82 S Ct 631, 9 L Ed 2d 584), four opinions; *Jacobellis v. Ohio* (1964), 378 US 184 (84 S Ct 1676, 12 L Ed 2d 793), five opinions; *A Quantity of Books v. Kansas* (1964), 378 US 205 (84 S Ct 1723, 12 L Ed 2d 809), four opinions; *Memoirs v. Massachusetts* (1966), 383 US 413 (86 S Ct 975, 16 L Ed 2d 1), five opinions; *Ginzburg v. United States* (1966), 383 US 463 (86 S Ct 942, 16 L Ed 2d 31), five opinions; *Mishkin v. New York* (1966), 383 US 502 (86 S Ct 958, 16 L Ed 2d 56), four opinions. (From Justice Harlan's opinion in *Interstate Circuit, Inc. v. City of Dallas* [1968], 390 US 676 [88 S Ct 1298, 20 L Ed 2d 225, 244].)

On the basis of a complaint obtained by the officers of the censor bureau of the Detroit police department from one Albert Goldbaum, a retailer in the city of Detroit, alleging the sale to him of 81 different titles of magazines by defendant Doerfler, a warrant was issued out of the recorder's court for the city of Detroit on July 30, 1963, for his arrest.

On the same day, several police officers went to the warehouse and arrested Doerfler upon the warrant. Upon inquiry of the prosecuting attorney for Wayne County as to "exactly how far we could go legally", the police officers were instructed: "to clean the place out". Thereupon, they instituted a search of the warehouse and seized approximately 289 different magazines totaling over 20,000 copies.[2]

Although an examination was held in the recorder's court upon the complaint and warrant, the magazines seized from the warehouse were not offered in evidence or relied upon by the prosecutor in that proceeding.

Instead, on August 19, 1963, appellee filed the complaint in this case under CLS 1961, § 600.2938 (Stat Ann § 27A.2938), seeking an adjudication that the 289 titles were obscene and an injunction permanently restraining their possession, distribution or sale. An *ex parte* preliminary injunction was issued restraining defendants from possessing, distributing or selling any of the 289 magazines.

At this point, defendants removed the case to the Federal district court, but on motion of plaintiff, the case was remanded to the circuit court on January 6, 1964.

A motion to disqualify the trial judge, with supporting affidavit, was then filed by defendants. The

---

[2] Defendants never have been able to ascertain the exact number of magazines seized.

motion was denied by the trial judge and, again, in a written opinion by another circuit judge to whom the motion was assigned.

A motion for summary judgment (originally filed as a motion to dismiss), asserting the unconstitutionality of the Michigan obscenity statute and the search and seizure of the magazines, was then filed, heard and denied by the trial judge. On December 21, 1964, defendants filed their answer to the complaint.

On the opening of the trial, May 16, 1966, a motion to postpone trial was filed by defendants, based upon a claim of prejudice arising out of a series of TV programs broadcast in the community during the week immediately preceding the trial, entitled "Exposé: Smut". The motion was denied.

During the course of the 2-week trial, motions for mistrial were made by defendants by reason of continued TV broadcasts, a TV interview with the trial judge, the massing of the 20,000 magazines in boxes behind defendants and their counsel, and the injection into the testimony of the issuance of a Federal indictment against a "principal" of defendant corporation. All motions were denied.

Other rulings of the trial judge, particularly those which excluded certain magazines sought to be used by defendants for the purpose of comparison on the issue of community standards, and the trial judge's charge to the jury which permitted it to consider the effect of the magazines on children over 13 years of age, were made over objection by defendants.

The jury began its deliberations on May 26 and returned its verdict on June 23. It found 141 magazines obscene, 63 not obscene, and 33 on which it could not agree.

A judgment was entered on August 12, 1966, permanently enjoining the sale or distribution of the 141 magazines which were found obscene, and of identical magazines, and directing the sheriff to destroy them; and ordering the return of the 63 magazines found not obscene as well as the 33 magazines on which the jury was unable to agree.

A stay of proceedings was entered by the trial judge on August 23, 1966, to hold up the destruction of the 141 magazines during the appeal.

### COUNTERSTATEMENT OF FACTS BY PLAINTIFF

Defendants' statement of facts relates matters not material to this action. Without attempting to correct any misstatements made therein, plaintiff affirmatively states that the only material fact, which incidentally is not in dispute, is that certain enumerated magazines were brought before the Wayne County circuit court in this action pursuant to provisions of the Michigan statute (cited *supra*) and a determination sought as to their obscenity. This issue was the sole issue contemplated by the statute and was the sole issue determined in this action. All other issues attempted to be injected into this action by the defendants were correctly ruled not material and excluded.

The statute provides (paraphrasing) that the prosecuting attorney of the county may institute and maintain an action in the circuit court against any person, firm, or corporation to enjoin and prevent the sale or distribution of any  *  *  *  magazine  *  *  *  of an indecent character which is obscene, lewd,  *  *  *  which contains an article  *  *  *  of indecent or immoral use or purpose.

A jury was empaneled and the magazines offered to the jury for a factual finding of obscenity.

Of the 237 separate and distinct issues so offered, the jury found 141 obscene, 63 not obscene, and 33 on which they could not agree.

As a result of said finding, the court, pursuant to the statute, entered an order so declaring; further ordering the destruction of those found obscene, and ordering the return to the defendants of the rest and remainder. Subsequently, upon defendants' claim of appeal, a stay of proceedings was ordered on those previously ordered destroyed.

Other facts and other issues have been raised by the defendants both here in this action and in other actions in the recorder's court for the city of Detroit and in the United States District Court. Those actions are dispositive of all other issues. Those decisions are and will be *res judicata* in those cases. They are not material to this action and their interjection into these proceedings is designed solely to confuse the real issue, to wit: obscenity of the magazines.

## STATUTE

The pertinent portions of CLS 1961, § 600.2938, upon which the complaint in this proceeding is based, are as follows:

"(1) The chief executive or legal office of any city, village or charter township or prosecuting attorney of the county may institute and maintain an action in the circuit court against any person, firm or corporation to enjoin and prevent the sale or further sale or the distribution or further distribution or the acquisition or possession of any book, magazine, pamphlet, comic book, story paper, writing, paper, picture, drawing, photograph, figure or image or any written or printed matter of an indecent character, which is obscene, lewd, lascivious, filthy, indecent or disgusting, or which contains

an article or instrument of indecent or immoral use
or purports to be for indecent or immoral use or
purpose.

\*     \*     \*

"(4) A preliminary injunction or restraining
order may be issued upon or at any time after the
filing of the complaint. The person, firm or cor-
poration sought to be enjoined is entitled to a trial
of the issues within 1 day after joinder of issue
and a decision shall be rendered by the court within
2 days of the conclusion of the trial.

"(5) If a final order or judgment of injunction
is entered in favor of such officer of the city, village
or charter township and against the person, firm
or corporation sought to be enjoined, the final order
or judgment shall contain a provision directing the
person, firm or corporation to surrender to the sher-
iff of the county in which the action was brought
any of the matter described in (1) and the sheriff
shall be directed to seize and destroy the same.

\*     \*     \*

"(9) Nothing in this section shall be construed to
preclude or impair prosecution in the criminal
courts for violation of any section of the Michigan
penal code relating to obscene or other similar mat-
ters except when an adjudication has been made
under the procedure authorized herein to the effect
that the book, picture, or other subject of adjudica-
tion is not violative of any such law such adjudica-
tion is full protection for all persons against any
prosecution for criminal penalties or other action
in respect of the subject of such adjudication."

1

Defendants entered a motion to disqualify the
trial judge[3] and the judge denied it. The issue was
then presented to another judge in the Wayne Coun-

3 GCR 1963, 405.

ty circuit court[4] and it was denied again. The trial
judge was a former president of the Archdiocesan
Council of Catholic Men. This organization worked
on occasion with the National Office for Decent
Literature (NODL) to prevent the distribution of
obscene literature to children. In their affidavit to
support this motion to disqualify the trial judge,
the defendants state the judge was very active in
these groups and that he often contributed to the
attempt to motivate the community against the sale
of obscene literature.

We reproduce a portion of GCR 1963, 405:

".1 Grounds for disqualification. The issue of dis-
qualification of a judge to hear an action may be
raised by motion of any party or by the judge upon
his own motion. * * * The judge shall be deemed
disqualified to hear the action when the judge:
* * *

(3) is personally biased or prejudiced for or
against any party or attorney;
* * *

(8) for any other reason is excluded or disquali-
fied from sitting as a judge at the trial."

Thus, we are concerned with the alleged partiality
of the trial judge by reason of these prior activities
which, by defendants' theory, must measurably color
his perceptions in searching for redeeming value
of questioned literature. With reference to GCR
1963, 405.1(3), it is apparent that the trial judge is
not personally biased against any party or attorney,
but rather that his alleged prejudice is held against
the subject matter at issue. Thus, subsection (8)
would be applied. The determination of the remote-
ness of the private activities of the judge, from the
subject matter at hand, becomes relevant to this

---

4 GCR 1963, 405.2.

accusation of the denial of due process by reason of judicial prejudice.

Justice Cardozo has stated:

"Deep below consciousness are other forces, the likes and dislikes, the predilections and the prejudices, the complex of instincts and emotions and habits and convictions which make the man, be he litigant or judge."[5]

A judge is not expected to bring with him to the bench a blank mind and personality, as he becomes, by necessity, a composition of the general experiences of his life, refined and honed by his legal training and legal experience so that the desired judicial temperament will hopefully emerge.[6] To require a blank mind is unreasonable, but to demand an impartial and clear appraisal of each new case is not. A judge may well be subconsciously prejudiced in one way towards the evidence or the parties in a case before him. It is his duty not to permit these prejudices to override his responsibilities in providing a fair forum for the determination of controversy. This duty should ideally motivate the judge to request reassignment of the case if he is aware of any prejudices which he holds which would interfere with his impartiality.[7] If the judge refuses to do so, and the appellate court finds from the record that the judge was apparently prejudiced, then reversal is often the only remedy.[8]

Defendants would distinguish this case from that where murder or drunken driving is in issue, for the prejudices of men against such behavior are practically universal and judges often speak out

[5] Cardozo, Nature of the Judicial Process, p 167.
[6] Public Utilities Commission of the District of Columbia v. Franklin S. Pollak and Guy Martin (1952), 343 US 451, 466 (72 S Ct 813, 96 L Ed 1068).
[7] Hirych v. State Fair Commission (1965), 376 Mich 384.
[8] Ibid.

and act publicly in an attempt to stem such clearly defined anti-social behavior. If disqualification could be based on such prejudices, then admittedly no judges would be left to try the cases. However, here, according to the defendants, the trial judge is presented with a nebulous case of first impression where the opinions and consensus of men are not so universally defined. Thus, the trust which our society places in the discipline and ability of the judge to lay aside his private views and to remain neutral in the case before him is allegedly not well-founded as the judge will be unable to do any better than did the courts preceding him in proposing or applying a definitive standard of obscenity and of right and wrong. It is feared that the result would be that his personal and private views would supersede his expressed desire and intention to remain impartial.

An appellate court must demand actual proof of claimed prejudice when reviewing the non-judicial activities of a judge, and when none is forthcoming that court must find that no violation of due process has occurred. The language of GCR 1963, 405.1(8), apparently a catch-all phrase, still requires some actual showing of prejudice and it will not encompass the unfounded fears of defendants. The activities of the trial judge have been reviewed by this Court and we believe them to be no more than general public statements made with the intent of educating the community as to the existence and spread of obscene literature among young people. The judge had attempted to temper his remarks and to qualify them, noting that he was not attacking any specific type of publication, for precise definitions and applications of an obscenity statute are best left to the courts, the legislature, and the jury. No evidence has been offered which would demand a rever-

sal by reason of the association and membership of the trial judge in a group which, on occasion, has sought to have obscene literature removed from the access of children. Defendants offer no cases in which a judge was disqualified on the theory advanced here, or on any facts similar to those in this case. Accordingly, we find the disqualification properly denied.

2

WJBK–Television, broadcasting in the city of Detroit, presented a series of documentaries during the week immediately preceding this trial and up to the date set for the trial. The documentaries were entitled "Exposé: Smut" and were aired each evening on the 6 o'clock and 11 o'clock news broadcasts. Advertisements were placed in the local newspapers concerning the programs and the station employed such enticing words as "crackdown", "lurid", "shocking", and "shameless" to encourage the viewers to tune in. The content of the programs ranged from an interview with a psychiatrist at Wayne State University, to a condemnation of nudist magazines as being the most damaging to teen-agers, and included a revelation of those areas in Detroit and surrounding suburbs where that literature as interpreted by WJBK–TV as obscene might be found. The counsel for the prosecuting attorney of Wayne County appeared on one of these programs only 4 days before the trial was to begin, and commented on the failure of the *Roth* rule[9] to prevent a jury from adding their own subjective feelings to their interpretation of the existing standard of obscenity. A "journalistic definition" of which literature is obscene was employed by

---

[9] *Roth* v. *United States* (1957), 354 US 476 (77 S Ct 1304, 1 L Ed 2d 1498).

WJBK–TV and was stated to be any material which was "morally fouling" and reveling in the lewd and lustful. "Examples" of "smut" were shown by the television station. We agree with the defendants that the programs were essentially one-sided and that there was no attempt made to distinguish magazines of the "girlie" or nudist type which have been deemed acceptable from legally pornographic or obscene magazines, and that no effort was made to differentiate the standards applied to literature intended for adults from those restrictions properly placed on acceptable literature for children. Defendants' motion for a reasonable continuance to a later date until the TV editorializing ceased was denied by the trial court.

The trial judge appeared on WJBK–TV in his chambers after the second day of the trial and discussed his denial of the motion for a reasonable continuance. Defendants find prejudice abounding in the series of editorials broadcast a week preceding the trial, the appearance of the counsel for the prosecuting attorney on one of the programs, and this appearance of the trial judge during the trial, on the same program which previously broadcast the "exposé". A motion of the defendants for a mistrial was denied.

We are concerned with the possible prejudicial effects of the programs and the interviews upon the objectivity of the deliberations of the jury. The relevant community involved in this case, and reached by this broadcast, is all of Wayne County, which has a population of more than 2,000,000 people from which a jury may be selected, and not the entire broadcasting range of the station. The witness for WJBK–TV testified that the 2 newscasts would be seen by approximately 200,000 viewing homes in a single day. On the *voir dire,* each juror

was asked if he had seen any of the programs in issue, and, with one exception, they all answered that they had not seen any of the programs. That juror who had seen one of the editorials could not remember the contents nor the details of that program.[10] This is unlike the *voir dire* in *Marshall* v. *United States* (1959), 360 US 310, 79 S Ct 1171, 3 L Ed 2d 1250), where 7 of the 12 jurors had admittedly read certain prejudicial newspaper articles in question, but stated that they would not be prejudiced toward the defendants by reason of having read those articles, with the Court holding that their denial of any personal prejudice and their promise that they would attempt to be fair, was not sufficient in and of itself to dispense with any possibility that they could be nonetheless prejudiced. The possibility of prejudice to the defendants in the present case is so remote as to be unworthy of our consideration of the existence of any subjective influence upon these jurors who hadn't seen the television programs in issue, nor upon the juror who could not remember the content of the broadcast.

3

Eighty magazines were introduced in the original criminal trial against the defendant who was then acquitted by a jury. Defendants first sought an entry of summary judgment as some of these magazines were originally included in the complaint in this case. The prosecutor agreed to the entry as to those publications which he knew to be a part of the complaint. The order granting summary judgment was entered as to 4 publications. It was

---

[10] The flagrant rantings of the Cleveland newspapers, when combined with the myriad of courtroom antics in *Sheppard* v. *Maxwell* (1966), 384 US 333 (86 S Ct 1507, 16 L Ed 2d 600), are in no way comparable to the particular facts of this case.

the intent of the prosecutor to have eliminated in this trial all of the magazines introduced at the criminal trial. However, counsel for defendants showed that 10 of the magazines had been introduced here anyway (albeit inadvertently), and seen by the jury so that he should be permitted to cross-examine the defendants as to the findings of the jury in the criminal case. Counsel also alleged that this jury was entitled to know why certain of the other magazines had been withdrawn by the prosecutor. In fact, the prosecutor attempted to withdraw all the magazines in issue when his mistake was made known. The trial judge added the 10 magazines to the 4 previously withdrawn. However, the jury had seen the 10 magazines and by reason of the court's belief that the prior determination of the nonobscenity of these identical magazines was not to be offered to this jury, the court decided in favor of the prosecutor and the prior verdict on all of these magazines was removed from the jury's consideration.

The error here alleged by the defendants is that this jury was erroneously denied the opportunity to know that these 10 magazines, similar in content to the other 237 magazines on trial here, were withdrawn after being seen by this jury because the identical 10 magazines were found to be nonobscene by another jury. We agree with counsel for the defendants that "this is a peculiar proceeding."

The basic issue discussed on the trial is whether the verdict in a criminal case can be subsequently used in a civil case. The issue is confused by the unique proceeding here where, first, the defendant was on trial to determine his criminal intent in selling obscene magazines, said magazines being found to be nonobscene, thus negating such criminal intent, and then this case, where only the mag-

azines themselves are on trial. In addition, the particular posture of obscenity cases requires the jury to be provided with a standard to be used in evaluating the evidence presented. To carry the problem one step further in an attempt to set out the issue, we note that the test to be applied by the jury to the magazines is the often vague one of "prevailing contemporary community standards".[11]

The essence of defendants' argument is as follows: The jury is ideally a microcosm of the community, selected by legal process to reflect the standards of tolerance of the community as a whole regarding such magazines. Thus, knowledge of the findings of another jury as to the same magazines and the same defendant would allegedly be of vital assistance to this jury in measuring what the "community standards" of Wayne County are. Apparently, for purposes of the present argument, the determinations of a California jury[12] as to the non-obscenity of these identical magazines would not be considered by our Wayne County jury and, in addition, similar magazines taken from newsstands in the community might not be introduced as evidence that by their presence they are tolerated by the community.[13]

The question is: What resources are available to the jury to assist them in applying "contemporary

---

[11] This phrase is intended to be one of the tests formulated by the decision in *Roth* v. *United States, supra.*

[12] The exact "community" intended by *Roth* has not yet been determined by the United States Supreme Court, but the point here made by defendant is that the verdict of a Wayne County jury sets a community standard and is thus relevant to this issue. But see *Excellent Publications, Inc.* v. *United States* (1962), 309 F2d 362. The trial court in our case charged the jury to a "national" standard as agreed to by the parties.

[13] *People* v. *Finkelstein* (1962), 11 NY2d 300 (229 NYS2d 367, 183 NE2d 661); but see *Yudkin* v. *State* (1962) 229 Md 223 (182 A2d 798).

community standards" to questionable literature? As an average small community itself, for the purposes of this trial, the jury is required to make an independent determination of such standards as applied to the particular magazine. Such is the intent of the *Roth Case*. It has been held that questionable magazines may be compared to those books which the public has tolerated, thus indicating that they do not violate community standards.[14] The subjective and personal beliefs of the individual juror may thus be assisted or aided to some degree as such beliefs may be insufficient alone to enable the juror to make a fair evaluation of the tolerance of the entire community.

Were these identical 10 magazines among only 25 or 30 magazines in issue at the civil trial, we would be faced with a situation where a prior verdict that they were nonobscene might well be relevant to this jury's deliberations. However, on examination of these 10 magazines, we find that although they were indeed once seen by the jury, then removed, they could not fairly be said to be outstandingly different in content from the other 237 separate titles on trial. We must ask whether if the defendants were cross-examined, and revealed that these 10 magazines were removed because they were found to be nonobscene, this information would substantially assist the jury in formulating a "contemporary community standard" when the magazines were no longer available to them for re-examination. We must answer "no". The collective mind of the jury must be boggled by the great number of separate titles, and separate volumes of one title, so that any revelation that a certain title and volume of magazine was found nonobscene by an-

---

[14] *Smith* v. *California* (1959), 361 US 147 (80 S Ct 215, 4 L Ed 2d 205).

other jury would only confuse this jury as such magazines were now available. Also, volume 1 of "X" magazine, being judged nonobscene by the criminal jury, is now unavailable for comparison with volume 2 which might still be before the jury.

We do not attempt to answer the question of whether a prior criminal verdict is a resource for a later civil jury in an obscenity case by applying these particular facts. Knowing the reason for the exclusion of the 10 magazines, as explained by defendants, would not assist the jury in any beneficial way and would only serve to confuse them.

In addition, as we have noted above, the status and content of a magazine may vary in the different setting of a criminal case as distinguished from a civil case,[15] and, of necessity the instructions of the court to the jury may vary in content, depending on the nature of the proceedings. Such variables do not merit further discussion here in light of the above disposition of this issue.

Two related issues as to the resources available to the jury remain under this heading. The defendants moved for a directed verdict at the close of the prosecutor's proofs, alleging that there was insufficient evidence presented as to "community standards". The court denied this motion, stating that the existence of the magazines alone is sufficient to create a question of fact for the jury, and that no additional evidence need be presented by the prosecutor. The trial court also quotes from the opinion of Justice Brennan, in the *Roth Case,* as follows:

"If there is before a jury the evidence upon which the minds of men may generally disagree what is or is not obscenity, then a jury fact question is created."

---

[15] See brief discussion on this point at 5 ALR3d 1158, § 13(a).

The defendants cite one case in support of its allegation that further evidence is necessary to show the jurors what material appeals to "prurient interests"[16] so that they may be aided in finding the elusive "community standard" beyond their own limited and uninformed knowledge.

The theory of the court in the *Klaw Case* is that the material may well be offensive, "disgusting[17] and revolting" and "vulgar" in the opinion of that jury, but that this isn't sufficient evidence in itself to show that it appeals to "prurient interests", for the jury may decide that it does so appeal merely because they don't like the material themselves.

The basic question is what is the "prurient appeal" of this material to the average person?[18] The use of psychiatrists as expert witnesses is widespread in our courts and they are often asked if the material in question would appeal to "prurient interests".[19] However, we do not feel that their absence in the present case entitled the defendant to a directed verdict. In the *Klaw Case,* the material in issue dealt with bondage, and perhaps expert testimony was necessary to show that jury that such material appealed pruriently only to maso-

---

[16] *United States* v. *Klaw* (CA 2, 1965), 350 F2d 155.

[17] Note use of the word "disgusting" in CLS 1961, § 600.2938, which appears to equate "disgusting" and "filthy" among others with "obscene". This would seem to strengthen defendants' use of the *Klaw Case,* but they do not mention this point at all in this appeal.

[18] *Roth* v. *United States, supra.*

[19] See *United States* v. *One Carton Positive Motion Picture Film* (SD NY, 1965), 247 F Supp 450; *Memoirs* v. *Massachusetts* (1966), 383 US 413, (86 S Ct 975, 16 L Ed 2d 1), wherein the Massachusetts statute (Gen Law of Mass, Ch 272, Sec 28F) specifically permits expert testimony as to the literary value of the book and the manner of its publication and distribution. We are generally concerned here with photos of undressed "girls" and written short stories describing brief sexual encounters between constantly aroused characters. No qualified literary expert, in our opinion, could find any literary value at all in any of these magazines, and there is no need to require the plaintiff to produce one to reinforce the obvious.

chists, which certainly make up a small segment of the community.[20] Thus, additional testimony might well be desirable to aid that jury in the light of the particular material in issue, but here, where the prurient appeal of these "girlie" magazines is clearly aimed at the *average* "virile" male, such expert assistance could well inhibit[21] the desired freedom of this Wayne County jury to interpret the average standards of their community.[22] Here, "the best evidence of all is the book itself",[23] and we cannot say that the absence of any other evidence offered by the plaintiff conclusively entitled these defendants to a directed verdict by the court.

Defendants also allege that a related error occurred when the trial court prohibited *them* from introducing expert testimony. Support is found in one case[24] where the Supreme Court of California stated that it was a denial of due process for the trial court to have denied defendant the opportunity to prove "contemporary community standards" by the use of expert testimony. However, defendants convolute this issue by using it in attempting to press the argument on the issue of the prior jury verdict of nonobscenity, and the reference to the

---

[20] The ancient test of obscenity permitted the material to be judged by its effects on particularly susceptible persons (*Regina* v. *Nicklin* [1868], LR 3 QB 360). The *Roth Case* changes this to the *average person* test.

[21] Defendants cite to us the case of *United States* v. *West Coast News Co.* (WD Mich, 1964), 228 F Supp 171, *affirmed* 357 F2d 855, where the court states that generally expert opinion is not admissible on the issue of "prurient appeal".

[22] The prosecution in *Klaw* was under 18 USCA § 1461 for using the government mails in the carriage of obscene materials, and that jury was made up of 12 residents of New York City. They were charged to consider the material from the standpoint of an average man in the nation as a whole. The court expressed doubt that such a jury could make such a judgment without being further informed about the "common conscience of the nation".

[23] *People* v. *Fritch* (1963), 13 NY2d 119 (243 NYS2d 1, 192 NE2d 713).

[24] *In re Harris* (1961) 56 Cal 2d 879 (16 Cal Rptr 889, 366 P2d 305).

*West Coast News Case*[25] is to the holding of that Court that expert evidence is admissible to show "contemporary community standards" when it is first established that he is a recognized expert in knowing what these standards are. We agree with the *West Coast* Court that such an expert is indeed hard to find. Plaintiff, in attempting to meet this vague argument of the defendants, assumes that the defendants would have offered a sociologist or a literary expert to testify on their behalf. We dispose of this portion of this issue by noting that the defendants did not attempt to present any foundation of that type of expertise, as required by *West Coast,* to the trial judge when they sought to employ their still unknown experts.

We are primarily concerned with assisting the jury and as we have mentioned in footnote 18, *supra,* even a cursory examination of these "girlie" magazines leaves no doubt that an expert could find no literary merit therein, unlike most of the previously cited cases where books were in issue.

In an attempt to aid the defendants in clarifying their position here, we have searched the record to find if there was another "expert" who was not permitted to testify. The defendants had sought to call one Mr. Marks, police officer and member of the Detroit Police Censor Bureau, as an adverse witness, being allegedly an agent of the prosecutor, but this theory was refuted by the trial court. The court then stated that the defendants could call Mr. Marks as their own witness and that a general examination of Mr. Marks could begin. The defendants chose not to do so. We assume that the objection, if this is really what is intended by the defendants, is with the refusal of the trial court, made at the beginning of the trial, to permit the exam-

---

25 *United States* v. *West Coast News Co., supra.*

ination of Mr. Marks on which other allegedly comparable magazines were "permitted" to circulate in the community by the censor board. This allegedly would establish what the "contemporary community standards" were in 1963. We have seen that the fact of the presence of other magazines in Wayne County does not necessarily mean that they are tolerated by the average person in the local community or in the nation.[26] A censor is not such an expert on community standards as to be permitted to influence the jury with his interpretation of obscenity, and the exclusion of his testimony is not error.

4

The trial court was requested by both parties to instruct the jury to consider only the effect of the magazines on the "average adult" in the community pursuant to the case of *Butler* v. *Michigan* (1957), 352 US 380 (77 S Ct 524, 1 L Ed 2d 412), wherein a Michigan statute which prohibited books which the trial court found to have a "potentially deleterious influence" on minors was negated on the ground that the statute restrained freedom of the press by reducing the available reading material of Michigan adults to only that which was fit for children. Instead, defendants allege, the court permitted the jury to consider the effect of the magazines upon "children over 13 years of age" by way of its instructions to the jury as follows:

"I say to you that in determining this average adult person, *you may not consider the effect of these magazines on children,* but we must pause for a moment. It is within your realm as jurors to

---

[26] We also note that by agreement of the parties, it is the standards of the "national community" which are being evaluated. See footnote 12, *supra.*

determine at what point one ceases to become a child and assume adulthood. * * * (Emphasis supplied.)

"Adulthood and infancy, or childhood, we say, is variable. In Michigan one becomes an adult legally to vote and enter into a contract at twenty-one. * * * Other states, such as New York, one is an adult when he reaches sixteen. At the common law generally, it is twenty-one. *The old civil law set it at fourteen.* Other states have it at seventeen. Other states at eighteen and some of them at nineteen. (Emphasis supplied.)

"In determining when a person becomes an adult, as I shall tell you later, you must apply standards that would be applicable throughout the country and you, in deciding what this average hypothetical person is, must also take into consideration at what point this hypothetical person attains the age of adulthood. You may ask yourselves, would it be in terms of when he reaches maturity physically, mentally, the age of puberty? On a national standard, when does a person reach adulthood? That is the adult that we are talking about."

By its brief mention that adulthood began in the old civil law at the age of fourteen, the trial court, the defendants claim, informed the jury that it could so consider a child of 14 to be an adult for purposes of this case, thus prejudicing defendants in violation of *Butler.* It is also alleged that the trial court failed to provide the jury with guidance for their determination of what age *does* constitute adulthood for purposes of obscenity cases.

We agree with the plaintiff and the trial court that such a determination is difficult, if not impossible, to make, given the variances in individual maturity during adolescence. The Court in *Redrup* v. *New York* (1967), 386 US 767 (87 S Ct 1414, 18 L Ed 2d 515), has since attempted to defend the protected child by stating that such children are

"juveniles". Whether this definition will help remains to be seen and we will not apply it in our analysis of the present instruction complained of. It appears, however, that courts and juries will now reverse the former procedure and now investigate, as a prime concern, the effect of the magazine on juveniles. Such are the confusions running rampant through these cases, bewildering publishers, magazine distributors, trial counsel, trial courts, juries, and even, on occasion, appellate courts.

We find no prejudice resulting from this instruction. It is not likely that the jury, after listening to this instruction, would consider the effect of the magazine on children where the intent of the trial court, as clearly and adequately expressed, was to inform the jury to the contrary. It was necessary for the trial court to require the jury to determine the age of "adulthood" as it may be required to determine "juvenile" today under *Redrup* in the absence of a definitive statute. To argue that, despite an instruction clearly to the contrary, the judge permitted his alleged bias toward protecting children to influence the jury, is to engage in speculation and inference where the alleged violation of constitutional rights is not clearly apparent. This we will not do.

5

Defendants objected to the use in evidence of the magazines seized at the time the arrest was made. The first objection to the use of this material was by way of motion for summary judgment which was denied by the trial court on December 1, 1964. Objection was again offered at trial on the ground that the magazines had been illegally seized. The State's argument was to the effect that the magazines were not illegally seized and the seizure was made in the

course of a valid arrest. They argue further that the entire issue would only be relevant in a criminal prosecution and that the instant action was civil in nature.

There appears to be a dearth of reported cases covering the precise issue before us, *i.e.,* the admissibility, in a civil proceeding, of evidence seized in the course of an arrest in a criminal proceeding. The trial court agreed with the prosecution that the entire matter was not relevant to the case at hand in the following words:

"Defendants urge that the method and manner in which the seizure of some twenty thousand magazines which defendants had in their possession in the usual course of their business was in violation of their rights to be secure against unreasonable search and seizure. It must be pointed out here that the magazines seized by the Detroit Police Department, as alleged in plaintiff's complaint, were seized at the time a warrant issued by the Recorder's Court for the City of Detroit was served upon the defendant, William Doerfler. These magazines were thus so seized and were to be used in the criminal prosecution pending in another court. This court is not concerned either now or at any time, with the search and seizure or the admissibility of the evidence so seized by the Detroit Police Department in the course of the prosecution in the Recorder's Court for the City of Detroit. The propriety of that search and seizure or the admissibility of the evidence seized must be passed upon by the Recorder's Court judge before whom the criminal prosecution is pending. This court does not sit as an appellate court from the Recorder's Court of the City of Detroit.

"This matter clearly is in the nature of a civil proceeding (which was at one time brought in a court of equity) for injunctive relief, both temporary and permanent. This court is urged to hold that there is no need for injunctive relief by reason of

the seizure of the magazines by the Detroit Police Department. As indicated heretofore, that seizure is of no concern to this court."

The authority cited by defendants for the proposition of inadmissibility of the magazines in this proceeding finds little support from their citation of the case of *Lebel* v. *Swincicki* (1958), 354 Mich 427, in which a blood sample taken from an unconscious person suspected of drunk driving was held to be inadmissible in a later civil damage action. Limited as it was to the taking of a blood sample from an unconscious person, it can furnish no authority here.

Continuing, however, the line of argument put forth by defendants that the statute itself, on its face and as applied in this case, is unconstitutional and in violation of defendants' constitutional right to be secure from illegal searches and seizures, we examine the larger area of law dealing with statutes of this kind. Again reference is made to the opinion of the trial court on the motion for summary judgment on this issue. It was dealt with in this manner:

"Defendants rely heavily on the recent opinion of the United States Supreme Court entitled, '*A Quantity of Copies of Books et al.,* v. *The State of Kansas*', issued June 22nd, 1964, wherein the United States Supreme Court, in an opinion written by Mr. Justice Brennan, reversed the Kansas court. A careful examination of that opinion necessitates an inescapable conclusion that the Kansas statute procedurally is not like that of Michigan. It is the opinion of this court that that decision is distinguishable from the instant case. The Kansas statute provides that upon information and belief, the county attorney or the attorney general, may obtain a search warrant, directed to a sheriff, to seize and bring before the judge issuing such warrant, such prohibited item or items. It provides among other things, that if no

person is found to serve such warrant, it may be posted in a conspicuous place upon the premises where found, and a warrant shall serve as notice to all interested persons of the hearing to be held not less than ten days after such seizure. At such hearing, the judge or justice issuing the warrant, shall determine whether or not the items so seized and brought before him are in violation of any of the provisions of the Kansas act. If he shall so find, he shall order such items to be destroyed. The important point is that the procedure following in issuing a warrant for the seizure of books and authorizing their impounding pending hearing was constitutionally insufficient because it did not adequately safeguard against suppression of nonobscene books. Significantly, the warrant ordering the seizure was issued after a forty-five minute *ex parte* inquiry during which the Kansas judge scrutinized seven books. This is quite unlike the Michigan procedure. First, it must be emphasized that under the Michigan act, the prosecuting attorney may apply for injunctive relief. While an *ex parte* restraining order was granted, this order can be, upon application, set aside or reviewed within twenty-four hours thereafter. Moreover, nowhere does the Michigan statute provide for seizure *ex parte,* but only after judicial determination when all parties have been heard. In short, only after final order or judgment of injunction is entered in favor of the plaintiff herein shall the sheriff be directed to seize and destroy the items involved.

"*Emphatically,* therefore, *no seizure is provided for in the Michigan statute until full hearing on the merits in accordance with the statute.* As a matter of fact, it is not essential in the Michigan statute to seize at any time, even for evidentiary purposes. All that it is necessary is that at trial the proposed obscene items be admitted for evidentiary purposes to permit the court to determine whether or not the same are obscene within the Michigan statute, or within the definition of that term as announced by

the Supreme Court in numerous decisions. (As noted, *supra,* the fact that some such magazines were seized by Detroit police officers at the time they served the warrant upon this defendant for a criminal prosecution in another court in this jurisdiction is of no concern to this court whatsoever.) Moreover, *ex parte* seizure is made unnecessary under the Michigan procedure because all that would be necessary is that the defendant be served with a subpoena *duces tecum* to produce certain publications allegedly in his possession, or held for him or by him for distribution and sale. It might be well here to make reference to the discovery proceedings as known to Michigan practice, which would permit the plaintiff to depose the defendants to ascertain whether or not such publications were in their possession at the time of the commencement of the action. *It is to be emphasized that this is not a criminal matter. This is a civil action seeking injunctive relief. As far as this court is concerned, there was no seizure of any copies to be offered in evidence here.* This court is concerned with one issue: 'Should defendants be permanently restrained from distributing these publications?'

"The Michigan statute differs from that involved in *Marcus* v. *Search Warrant,* 367 US 717, as noted in *A Quantity of Copies of Books et al.,* v. *Kansas, supra.* In *Marcus,* the warrant gave police virtually unlimited authority to seize any publications which they considered to be obscene and was issued on a verified complaint lacking any specific description of the publications whatever to the judge issuing the warrant. In the instant matter, the Michigan statute does not authorize seizure until after hearing. Secondly, the plaintiff's complaint herein contains a detailed list labeled as an appendix, indicating or naming the publications which it, the plaintiff, claims to be obscene. This, again, differs from *Marcus* in that no warrant for seizure is involved. This proceeding is civil in nature, wherein the plaintiff seeks injunctive relief as was done in *Kingsley, supra.*"

We agree with the trial court's distinguishing of *A Quantity of Copies of Books* v. *Kansas* and *Marcus* v. *Search Warrant of Property, supra.*

Bolstering the validity of the statute before us is the case of *Kingsley Books, Inc.,* v. *Brown* (1957), 354 US 436 (77 S Ct 1325, 1 L Ed 2d 1469), in which the Court upheld as constitutional a New York statute[27] fashioned much like the one before us. Justice Frankfurter in the majority opinion stated that the due process clause does not limit the state to a criminal process in seeking to protect its people against the dissemination of pornography. Expanding this theme, he stated:

"Whether proscribed conduct is to be visited by a criminal prosecution or by a *qui tam* action or by an injunction or by some or all of these remedies in combination, is a matter within the legislature's range of choice."

Defendants urge one rather novel ground of appeal in alleging that the Michigan civil obscenity statute, on its face and as applied in this case, is so vague and uncertain as to render it unconstitutional. Their particular suggestion in this regard is that this court compare the three categories which resulted from the jury's efforts, more specifically, the 141 magazines found obscene and the 33 on which they could not agree. They suggest that there are no significant differences and, above all, none of constitutional dimensions.

Such a test is hardly a test of vagueness. The further suggestion that the word "obscene" is, in and of itself, too vague, falls also. As stated in 5 ALR3d 1214, citing *Roth:*

"The general view is that, applied under the proper constitutional standards, the term 'obscene'

---

[27] Sec 22-a of the New York Code of Criminal Procedure—Laws 1941 Ch 925.

is sufficiently definite to preclude a criminal statute or ordinance dealing with obscenity from being held invalid on the ground of vagueness."

The definition of "obscenity" established in *Roth* has become the standard for the country and this statute cannot be said to be vague with such a standard extant.

6

Defendants ultimately urge us to re-examine the actual magazines involved in this action and to declare that they are constitutionally protected. They base this contention on the cases of *Redrup* v. *New York, Austin* v. *Kentucky,* and *Gent* v. *Arkansas* (1967), 386 US 767 (87 S Ct 1414, 18 L Ed 2d 515). Support for their position is found in a flat statement taken from *Ginsberg* v. *New York* (1968), 390 US 629 (88 S Ct 1274, 20 L Ed 2d 195), in the following words:

"The 'girlie' picture magazines involved in the sales here are not obscene for adults, *Redrup* v. *New York* (with citation)"

and the following footnote:

"One of the magazines was an issue of the magazine 'Sir.' We held in *Gent* v. *Arkansas,* decided with *Redrup* v. *New York,* 386 US 767, 769, (87 S Ct 1414, 18 L Ed 2d 515, 517), that an Arkansas statute which did not reflect a specific and limited state concern for juveniles was unconstitutional insofar as it was applied to suppress distribution of another issue of that magazine. Other cases which turned on findings of nonobscenity of this type of magazines include: *Central Magazine Sales, Ltd.* v. *United States* (1967), 389 US 50 (88 S Ct 235, 19 L Ed 2d 49); *Conner* v. *City of Hammond* (1967), 389 US 48 (88 S Ct 234, 19 L Ed 2d 47); *Potomac News Co,* v.

*United States* (1967), 389 US 47 (88 S Ct 233, 19
L Ed 2d 46); *Mazes* v. *Ohio* (1967), 388 US 453 (87
S Ct 2105, 18 L Ed 2d 1315); *A Quantity of Books*
v. *Kansas* (1967), 388 US 452 (87 S Ct 2104, 18 L
Ed 2d 1314); *Books, Inc.* v. *United States* (1967),
388 US 449 (87 S Ct 2098, 18 L Ed 2d 1311); *Aday*
v. *United States* (1967), 388 US 447 (87 S Ct 2095,
18 L Ed 2d 1309); *Avanzino* v. *New York* (1967), 388
US 446 (87 S Ct 2093, 18 L Ed 2d 1308); *Friedman*
v. *New York* (1967), 388 US 441 (87 S Ct 2091, 18
L Ed 2d 1303); *Keney* v. *New York* (1967), 388 US
440 (87 S Ct 2091, 18 L Ed 2d 1302); see also
*Rosenbloom* v. *Virginia* (1967), 388 US 450 (87 S Ct
2095, 18 L Ed 2d 1312); *Sunshine Book Co.* v. *Sum-
merfield* (1958), 355 US 372 (78 S Ct 365, 2 L Ed
2d 352)."

Indeed, by midsummer 1968, the Supreme Court
had reversed a dozen and more obscenity actions
with *per curiam* opinions, citing only *Redrup*.

The best and most lucid interpretation of *Redrup*
that we have found appears in the case of *United
States of America* v. *4,400 Copies of Magazines,
Including 200 copies each of Magazines Entitled
"Cover Girl" Nos. 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and
16; and "Exciting" Nos. 6, 7, 8, 9, 10, 11, 12, 13, 14,
15, and 16* (1967), 276 F Supp 902, decided December
21, 1967, in the United States District Court for the
District of Maryland.  In that proceeding, the gov-
ernment sought condemnation and forfeiture of 200
copies of 22 magazines imported from Denmark on
the ground that they were obscene, importation of
such publications being prohibited by the Tariff Act
of 1930, 19 USCA § 1305.  The Court, admitting
that the magazines involved were more lewd than
any publications previously considered by that
Court, stated that they had no social value, were

clearly obscene in the ordinary sense of the word, and in the legal sense. They cite the language in *Redrup* as follows:

"In *Redrup* v. *New York,* the Supreme Court said, 386 US at 769:

" 'In none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles. See *Prince* v. *Massachusetts* [1944], 321 US 158 [64 S Ct 438, 88 L Ed 645]; *cf. Butler* v. *Michigan* [1957], 352 US 380 [77 S Ct 524, 1 L Ed 2d 412]. In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it. *Cf. Breard* v. *Alexandria* [1951], 341 US 622 [71 S Ct 920, 95 L Ed 1233]. And in none was there evidence of the sort of "pandering" which the Court found significant in *Ginzburg* v. *United States* [1966], 383 US 463 [86 S Ct 942, 16 L Ed 2d 31].' "

Their conclusion from this language is that the persons to whom the magazines will be offered commercially and the methods by which they will be offered are factors to be considered in determining whether their dissemination is protected by the First Amendment.

In this Maryland case, the magazines had not yet been admitted into the United States but were in the custody of the District Director of Customs in Baltimore. The court pointed out that it could not be sure how they will be marketed (a) whether they will be sold to juveniles, either by mail solicitation or over the counter, (b) whether they will be offered for sale in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to them, and (c) whether they will be offered for sale in a manner which will amount to pandering. They conclude by stating:

"This court is, therefore, of the opinion that it cannot order the condemnation and forfeiture of these magazines at this time.  On the other hand, this court is of the opinion that if the magazines involved in this case are sold to juveniles, or are offered for sale in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to them, or if they are offered for sale in a manner which amounts to pandering within the principles stated in *Ginzburg* v. *United States*, 383 US at 465–466, 467, 470–471, 474–476, they would not be entitled to the protection of the First Amendment."

There is a strong analogy with the instant appeal. The magazines in question reposed in a warehouse. They were the property of a magazine distributing company and had not yet been placed on newsstands for sale.  The public had not been exposed to them, they had not been offered for sale to the public, least of all to juveniles, and no manner of sale had yet been established for these specific publications.

We can only conclude from *Redrup* and its subsequent application by courts, Federal and state, that the prosecution here, under the *Redrup* doctrine, was premature and cannot stand, absent the factors set forth in *Redrup*.

The prosecution in this case is to be commended for a diligent application of the law as it existed in 1963.  The retroactivity of *Redrup* has not been questioned in any quarter and accordingly we apply it to this case, as courts consistently have.

In the light of present United States Supreme Court decisions, how an effective prosecution for, or limitation of, the distribution of obscene materials is to be maintained, we are at a loss to say.  The law, at least for today, is expressed in *Redrup*. Suffice it to say that society, which generally manages to control that which the majority finds unde-

sirable, will never close up shop. Public opinion, enlightened legislators, vigilant prosecutors—all will continue their labors and there are more good fights to be fought.

Reversed. No costs, a public question being involved.

T. G. KAVANAGH, P. J., and R. B. BURNS, J., concurred.